UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MONA LISA AT CELEBRATION, LLC, | ) | Case No.  6:09-bk-00458-KSJ |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LAURA BRUNO, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary Proc. No. 6:09-ap-49 |
| vs. | ) | |
| | ) | |
| MONA LISA AT CELEBRATION, LLC, | ) | |
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY, SUNTRUST BANK, and | ) | |
| BANKFIRST. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| KAREN DODSWORTH, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary Proc. No. 6:09-ap-769 |
| vs. | ) | |
| | ) | |
| MONA LISA AT CELEBRATION, LLC, | ) | |
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY, SUNTRUST BANK, and | ) | |
| BANKFIRST. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MOIRE MCKIBBIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary Proc. No. 6:09-ap-770 |
| vs. | ) | |
| | ) | |
| MONA LISA AT CELEBRATION, LLC, | ) | |
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY, SUNTRUST BANK, and | ) | |
| BANKFIRST. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

|  | ) |  |
|---|---|---|
| KATHRYN BENNETT, ET AL., | ) | |
| | ) | Adversary Proc. No. 6:09-ap-859 |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| MONA LISA AT CELEBRATION, LLC, | ) | |
| WESTCHESTER FIRE INSURANCE | ) | |
| COMPANY, SUNTRUST BANK, and | ) | |
| BANKFIRST. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The numerous plaintiffs in these four adversary proceedings each signed a purchase agreement to buy units in a hotel-condominium project developed by the debtor, Mona Lisa at Celebration, LLC.[1] The buyers no longer want to go forward with their purchases and have requested the return of their sizeable deposits alleging violations of various state and federal laws. Plaintiffs and defendants each have moved for summary judgment on some or all of the sixteen counts in plaintiffs' amended complaints.[2] Although the Court will analyze all counts in numerical order, and the defendants are successful on many, really most, of the disputes, in the end, the plaintiffs have established they are entitled to summary judgment on key portions of Counts VII, VIII, XV, and XVI, such that each plaintiff is entitled to void their purchase contracts and receive a refund of their deposits with interest, legal fees, and costs.

Mona Lisa marketed, developed, and sold units in a luxury hotel-condominium development in Celebration, Florida. From June 2005 through September 2007, plaintiffs entered

---

[1] Defendants, in addition to Mona Lisa, include its surety bond issuer, Westchester Fire Insurance Company, and the escrow agent for plaintiffs' deposits, SunTrust Bank. Unless noted otherwise, all references to docket numbers are to those in the Bruno Adversary 9-ap-49.

[2] Doc. No. 177.

into one of two types of agreements with Mona Lisa to purchase specific units. Initially, the contracts did not require Mona Lisa to complete construction within two years. These are the "Original Purchase Agreements." Starting in 2006, Mona Lisa changed the form of the contract to impose an obligation on itself to complete construction within two years. These are the "Updated Purchase Agreements."

Almost every buyer, regardless of which version of the contract was signed, made a deposit of more than 10% of the purchase price with Mona Lisa.[3] Most buyers made a down payment of between 15–20% of the unit's purchase price to Mona Lisa, who deposited the funds into an escrow account maintained by SunTrust, the escrow agent. In total, plaintiffs' deposits equal $3.38 million.[4] On December 1, 2006, Mona Lisa obtained a surety bond from Westchester Fire Insurance Company to allow it to withdraw the first ten percent of plaintiffs' deposits from the escrow account, as permitted under Fla. Stat. § 718.202.[5] Mona Lisa relied on Fla. Stat. § 718.202(3) to withdraw the balance of plaintiffs' deposits and to use the funds for purposes characterized as construction and development of the project.

Construction of the project is now complete. The development consists of 240 one- and two-bedroom suites within two separate buildings arranged in a semi-circular arc. Between the two hotel-condominium buildings lies a circular pool and hot-tub surrounded by approximately 23,500 square feet of decking and landscaping features. Also within the arc is a separate two-story multi-use building with visitor and resident amenities, including a reception area, bar, restaurant, and meeting facilities. Mona Lisa finished construction in early 2008 and obtained a

---

[3] All plaintiffs paid deposits in amounts over 10% of their purchase prices *except* the Byrnes, who paid deposits totaling exactly 10% of the purchase price for their two units, 303 and 319.

[4] As set forth in their Amended Complaints, the Bruno plaintiffs paid deposits totaling $1,433,825; the Dodsworth plaintiffs paid deposits of $572,550; the McKibbin plaintiffs paid deposits totaling $404,000; and the Bennett plaintiffs paid deposits totaling $966,000, for a total of $3,376,765.

[5] The surety bond originally was in the amount of $5,000,000, effective December 1, 2006. On December 1, 2007, Westchester issued a rider increasing the surety bond amount to $6,575,000. Doc. No. 125, Exhibit 3.

certificate of occupancy on May 7, 2008.[6] By the end of 2008, over 70 unit owners had closed on the sale of their units.[7]

Mona Lisa's business (like that of many other businesses in Orlando) was crippled by the financial recession of 2008. Property values plummeted. Many buyers refused to close on their sales contracts. To add to Mona Lisa's troubles, construction delays pushed back completion of the Mona Lisa development over a year from its original estimated closing date of April 30, 2007.

From May 2008 through January 2009, some plaintiffs brought individual actions against Mona Lisa in the United States District Court for the Middle District of Florida, seeking rescission of their purchase agreements. On November 7, 2008, the District Court consolidated these civil cases.[8] On January 15, 2009, Mona Lisa filed for Chapter 11 bankruptcy, automatically staying all District Court actions.[9]

During 2009, seventy-one plaintiffs filed four adversary proceedings against Mona Lisa alleging violations of various state and federal laws.[10] In two of the four adversaries, the parties

---

[6] Doc. No. 125, Exhibit 5.
[7] None of these owners are plaintiffs in this proceeding.
[8] Doc. No. 44 in 6:08-cv-735-orl-KRS.
[9] The District Court actions were stayed (Doc. No. 56 in 6:08-cv-735-orl-KRS) pending resolution of plaintiffs' motions for relief from stay to proceed with the lawsuits (Doc. Nos. 33, 42, and 43 in the main bankruptcy case), and administratively closed shortly thereafter on February 2, 2009. This Court denied the motions for relief from stay on May 15, 2009 (Doc. No. 138 in 6:09-bk-00458-KSJ).
[10] On February 25, 2009, 36 plaintiffs filed Adversary Proceeding No. 9-ap-49 (the "Bruno Plaintiffs") seeking $1,434,000 in damages. Three later adversary proceedings were filed. On May 26, 2009, 14 plaintiffs filed Adversary Proceeding No. 9-ap-769 (the "Dodsworth Plaintiffs") seeking $573,000 in damages. On May 25, 2009, seven plaintiffs filed Adversary Proceeding No. 9-ap-770 (the "McKibbin Plaintiffs") seeking $404,000 in damages. On August 26, 2009, 14 plaintiffs filed Adversary Proceeding No. 9-ap-859 ("the Bennett Plaintiffs") seeking $966,000 in damages. Mona Lisa was named as the sole defendant in the first eight counts of the complaints. Count IX was only asserted against BankFirst, who plaintiffs later voluntarily dismissed as a defendant pursuant to the four Joint Stipulations of Dismissal of Defendant BankFirst Only (*see e.g.,* Doc. No. 147). Count X sought declaratory relief against Mona Lisa, SunTrust, and Westchester, collectively. Plaintiffs from the first two adversary proceedings and the three remaining defendants then filed cross motions for summary judgment on Counts I-VIII and Count X.

filed cross motions for summary judgment on the ten counts asserted in the original complaint.[11]
The Court granted summary judgment[12] in favor of the defendants on most counts (Counts I –
III, and V – VII) but concluded a trial was needed on the remaining counts (Counts IV, VIII, and
X).[13]

Plaintiffs from all four adversary proceedings then filed amended complaints now
asserting these similar sixteen causes of action against the remaining three defendants—
Westchester, SunTrust, and Mona Lisa:

- **Counts I – IV –** Mona Lisa violated various provisions of the Interstate Land
  Sales Full Disclosure Act in 15 U.S.C. § 1701 *et seq.*

- **Count V –** Mona Lisa failed to file a registration statement in violation of the
  Securities Act of 1933.

- **Count VI –** Mona Lisa failed to file a registration statement in violation of the
  Investor Protection Act in Florida Chapter 517.

- **Count VII –** Mona Lisa failed to maintain separate escrow accounting for
  purchaser deposits, and Mona Lisa used purchaser deposits for improper
  purposes, in violation of Florida Condominium Act § 718.202.

---

[11] The Bruno and Dodsworth initial complaints both alleged the same 10 causes of action against Mona Lisa:
    **Count I**: Interstate Land Sales Full Disclosure Act (15 U.S.C. § 1703);
    **Count II**: 1933 Securities Act (15 U.S.C. § 77a);
    **Count III**: Florida Securities and Investor Protection Act (Fla. Stat. § 517.010 et seq.);
    **Count IV**: Florida Condominium Act (Fla. Stat. § 718.202);
    **Count V**: Florida Condominium Act (Fla. Stat. § 718.503);
    **Count VI**: Florida Condominium Act (Fla. Stat. § 718.506);
    **Count VII**: Florida Deceptive and Unfair Trade Practices Act  (Fla. Stat. § 501.201 et seq.);
    **Count VIII**: Breach of Contract;
    **Count IX**: Equitable Lien;
    **Count X**: Declaratory Judgment.
[12] Doc. Nos. 153-154.
[13] *In re Mona Lisa*, 436 B.R. 179 (Bankr. M.D. Fla. 2010). Count IX, asserted against BankFirst, was dismissed. The Dodsworth Plaintiffs appealed the Court's ruling. Doc. No. 158. District Court Judge Mary Scriven dismissed the interlocutory appeal without prejudice. Case No.: 6-10-cv-1352-Orl-35.

- **Count VIII –** Mona Lisa failed to file with the Division of Florida Land Sales, Condominiums, and Mobile Homes all the required documents and amendments, in violation of Florida Condominium Act § 718.502.

- **Count IX –** Mona Lisa failed to deliver a prospectus and disclosure statement with all exhibits to prospective purchasers, in violation of Florida Condominium Act § 718.503.

- **Count X –** Mona Lisa made material misrepresentations in advertising material for the purchase of a condominium, in violation of the Florida Condominium Act § 718.506.[14]

- **Count XI –** Mona Lisa's alleged violation in Counts I – X constitute per se violations of the Florida Deceptive and Unfair Trade Practices Act ("FDTUPA") in Fla. Stat. § 501.201 *et seq.*

- **Count XII –** Mona Lisa failed to notify purchasers that their units were part of a Community Development District, in violation Fla. Stat. § 190.04, which constitute a per se FDUTPA violation.

- **Count XIII –** Mona Lisa failed to notify purchasers of the type, thickness, and R-Value of insulation that was to be used in their units, in violation of 16 C.F.R. § 460.16, which constitute a per se FDUTPA violation.

- **Count XIV –** Mona Lisa failed to disclose that the units were subject to a home owner's association in violation of Fla. Stat. § 720.401.

- **Count XV –** Breach of Contract.

- **Count XVI –** Declaratory Relief.

---

[14] In connection with Count X, the Court addresses Counts XVII – XX regarding plaintiff Lieberman's claims that Mona Lisa misrepresented his unit's location behind the cabana restrooms.

Some of these counts are identical to ones the Court addressed in the first summary judgment decision,[15] and others are causes of action brought for the first time. For clarity, the Court will discuss whether summary judgment is appropriate for each count, taking them in numerical order.  Plaintiffs have moved for summary judgment on Counts I – IV, VII, VIII, XI, XV, and XVI,[16] and defendants have moved for summary judgment on *all* counts of plaintiff's amended complaints.[17] On October 6, 2011, the Court consolidated all four adversary proceedings and took plaintiffs' and defendants' cross motions for summary judgment under advisement.[18]

Under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] The moving party has the burden of establishing the right to summary judgment.[20] However, under Rule 56(c), the nonmoving party, in responding to a properly made motion for summary judgment, "may not rely merely on allegations or denials in its own pleadings; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."[21] Conclusory allegations by either party, without specific supporting facts, have no probative value.[22]

---

[15] Doc. Nos. 153–154.

[16] Doc. No. 205; Response (Doc. No. 223); Joinder in Westchester's Response, filed by Mona Lisa (Doc No.222).

[17] Doc. No. 207. Reply to Westchester Fire Insurance Company and Mona Lisa at Celebration, LLC's Responses to Motions for Summary Judgment and Supporting Memorandum of Legal Authority, filed by Plaintiffs (Doc. No. 231); Joinder in 6:09-ap-0770 and 6:09-ap-0859 Plaintiffs' Memorandum in Opposition and Response to Motions for Summary Judgment by Defendants Mona Lisa at Celebration, LLC and Westchester Fire Insurance Company and Supporting Memorandum of Legal Authority, filed by Plaintiffs (Doc No. 219); Reply memorandum of law in further support of its motion for summary judgment, filed by Defendant Westchester Fire Insurance Company (Doc. No. 228); Joinder in Westchester Fire Insurance Company's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, filed by Defendant Mona Lisa at Celebration, LLC (Doc. No. 229).

[18] Doc. No. 232.

[19] Fed. R. Civ. P. 56.; Fed. R. Bankr. P. 7056.

[20] *Fitzpatrick v. Schlitz (In re Schlitz)*, 97 B.R. 671, 672 (Bankr. N.D. Ga. 1986).

[21] *Evers v. General Motors Corp.* 770 F.2d 984, 986 (11th Cir. 1985).

[22] *Id.*

In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine dispute as to those facts."[23] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[24] A material factual dispute thus precludes summary judgment.[25]

## THE INTERSTATE LAND SALES FULL DISCLOSURE ACT (COUNTS I–IV)

The Interstate Land Sales Full Disclosure Act ("ILSFDA")[26] is a federal anti-fraud statute regulating the sale of certain real estate developments containing more than 100 "lots" of land.[27] The ILSFDA was enacted to stop shady developers from foisting undesirable realty onto unsuspecting or ill-informed investors and consumers.[28] The statute's principal purpose of "protecting purchasers from unscrupulous sales of undeveloped home sites" is effectuated primarily through mandatory disclosures.[29] Developers now are required to provide a detailed prospectus and make numerous disclosures to buyers who are purchasing pre-construction homes or contracting to purchase undeveloped real estate from remote locations sight-unseen.[30] The ILSFDA does not apply to all developers. As will be discussed, a developer can take measures to exempt a contract from the ILSFDA by providing alternate forms of protection.

In Counts I – IV, plaintiffs move for summary judgment under various sections of ILSFDA claiming "every critical disclosure provision of the ILSFDA was violated by Mona

---

[23] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[24] *Matsushita Elec. Industrial Co. v. Zenith Radio* Corp, 475 U.S. 572, 587 (1986).

[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

[26] 15 U.S.C. § 1701 *et seq.*

[27] ILSFDA generally applies to the sale of "lots" that are part of a sales program of 100 or more lots offered pursuant to a common promotional plan. 61 Fed. Reg. 13,601-02 (1996).

[28] *See* James Oliver, *Beyond Consumer Protection: The Application of the Interstate Land Sales Full Disclosure Act to Condominium Sales*, 37 UFLLR 945 (1985).

[29] *Gentry v. Harborage Cottage-Stuart, LLLP*, 654 F.3d 1247, 1258 (11th Cir. 2011).

[30] *See* James Oliver, 37 UFLLR 945 (1985) *Beyond Consumer Protection: The Application of the Interstate Land Sales Full Disclosure Act to Condominium Sales*.

Lisa."[31] Plaintiffs specifically claim Mona Lisa violated the ILSFDA: (1) by failing to give plaintiffs a property report and notices of utilities and amenities as required by § 1703(a)(Counts I and II), (2) by failing to notify plaintiffs that they had 7-day and 2-year statutory rights of revocation under § 1703(b) and (c)(Count III),[32] and (3) by failing to provide a lot description and default notices under § 1703(d)(Count IV).[33] For these alleged violations, plaintiffs seek damages, rescission of their contracts, refunds of their deposits, court costs, and attorney fees. Defendants, in response, contend they are entitled to summary judgment in their favor on these counts raised under ILSFDA.[34]  In general, the Court holds the defendants indeed are entitled to summary judgment under Counts I – IV, with the exception that a trial is needed to determine whether plaintiffs who signed Original Purchase Agreements and who brought claims within three years are entitled to damages, assuming they can establish that the units they were purchasing are "lots" covered by ILSFDA.

## ILSFDA Only Applies to Sales of "Lots"

The ILSFDA only applies to the sale of "lots" that are part of a sales program of 100 or more lots offered pursuant to a common promotional plan.[35] Plaintiffs and Mona Lisa disagree whether the units in Mona Lisa's hotel-condominium are "lots."[36] In 2010, this Court held that the analysis of whether ILSFDA would or would not apply to the hotel-condominium units sold by Mona Lisa is very fact-specific and not susceptible to resolution by summary judgment.[37] The Court did not address the factual lot issue because, even assuming the hotel-condominium units were "lots," no plaintiff at that time was entitled to summary judgment because all their ILSFDA

---

[31] Doc. No. 39 in Case No. 9-ap-859.
[32] Section 1703(b) unconditionally allows a purchaser to revoke a contract until midnight of the seventh day following the signing of such contract, and § 1703(c) allows a purchaser to revoke a contract until within two years following the signing of such contract if a developer does not provide a property report to the purchaser.
[33] Doc. No. 39 in 9-ap-859.
[34] Doc. No. 208.
[35] 61 Fed. Reg. 13, 601-02 (1996).
[36] 15 U.S.C. § 1703(a).
[37] *Mona Lisa*, 436 B.R at 189 n.19.

claims were time barred, unsupported by a factual allegation of damages, or plaintiffs' contracts were exempt from the ILSFDA.[38]

Plaintiffs now have filed amended complaints asserting new ILSFDA claims, and additional plaintiffs have joined the lawsuit.[39] The Court will re-address the timing of the ILSFDA claims, plaintiffs' allegation of damages, and Mona Lisa's additional defenses. Many of the plaintiffs' ILSFDA claims remain time-barred. On others, the defendants are entitled to summary judgment, assuming the hotel-condominium units *are* "lots" and the provisions of ILSFDA *do* apply. Summary judgment in favor of the plaintiffs, however, is still improper under any ILSFDA claim until the plaintiffs prove the units are "lots."

## Statute of Limitations under ILSFDA

As a threshold matter and assuming ILSFDA applies, plaintiffs must have timely filed their claims under ILSFDA's statute of limitations in order to bring an ILSFDA claim.[40] Pursuant to a recent binding decision of the Eleventh Circuit Court of Appeals, in the case of *Gentry v. Harborage Cottages-Stuart, LLLP,*[41] a buyer has *two years* from signing a sales contract to automatically revoke a contract under § 1703(c), but has *three years* to assert a damages claim under § 1711(b). In *Gentry*, the Eleventh Circuit Court of Appeals said:

> We agree with Plaintiffs that the district court's damages award is permitted under § 1709. Even though Plaintiffs are not entitled to the automatic statutory revocation remedies provided in 15 U.S.C. § 1703(c) because they did not attempt to revoke their contracts within two years from the date of signing the purchase contracts, they may still be entitled to the return of their deposits as equitable relief under § 1709. Where, as here, a developer violates § 1703(c)'s notice requirement obligating the developer to disclose to Plaintiffs their right to rescind, the purchaser may be entitled to relief under § 1709(b).
> . . .

---

[38] See *Mona Lisa,* 436 B.R. at 189.

[39] McKibbin and Bennett Plaintiffs in Case Nos. 9-ap-770 and 9-ap-859, respectively.

[40] *Mona Lisa* at 189–190 (adopting *Taylor v. Holiday Isle,* 561 F. Supp.2d 1269 (S.D. Ala. 2008)).The *Taylor* reasoning also was adopted by numerous other courts, as noted in *Harari v. Seymour Int'l, Inc.,* Case 6:09-cv-01277-ACC-GJK (February 8, 2009).

[41] *Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247 (11th Cir. 2011).

The two-year limitation period in § 1703(c) governs those circumstances in which an aggrieved purchaser seeks to enforce an automatic, unconditional right to revoke if the requirements of the subsection are met. On the other hand, the three-year limitation period in 15 U.S.C. § 1711 governs those circumstances in which a purchaser seeks rescission that is not automatic, but must be supported by proper proof. In other words, the automatic revocation or [rescission] remedy in § 1703(c) itself is not the only revocation or [rescission] remedy. In addition to that remedy, § 1709(b) permits a purchaser to obtain the deposit as an equitable remedy if the purchaser shows that the remedy is justified by the facts of a specific case.[42]

The two-year statute of limitation on automatic, "no questions asked" rescission applies regardless of whether the contract properly noticed plaintiffs of their right to rescind under ILSFDA and regardless of whether plaintiffs otherwise had actual notice of this right.[43] A plaintiff who did not timely file claim for automatic rescission within two years nevertheless has three years to bring a damages claim under the ILSFDA.  The damages claim may include a request for rescission of the contract that is justified under the circumstances; for example, if the developer wrongly refused to rescind the contract.[44] Any party who filed an ILSFDA claim *more than three years after signing a purchase agreement is completely time-barred from asserting either a rescission or damages claim under ILSFDA.[45]

In this case, based on the date each plaintiff filed its ILSFDA claims against Mona Lisa, the only plaintiffs who can bring *automatic rescission claims* under the ILSFDA are those who filed their claims within two years of signing the original purchase agreement. Appendix A lists the plaintiffs who filed timely rescission claims. (The Court notes each of these plaintiffs also signed Updated Purchase Agreements that, as will be discussed next, are exempt from ILSFDA.) The only plaintiffs who can bring *damages claims* are those who filed their claims within *three*

---

[42] *Gentry*, 654 F.3d at 1262.

[43] *Gentry*, 654 F.3d at 1262; *Taylor v. Holiday Isle, LLC,* 561 F. Supp.2d 1269, 1276 (S.D. Ala. 2008); *Mona Lisa,* 436 B.R., at 190 (rejecting *Plaza Court L.P. v. Baker-Chaput*, 17 So. 3d 720 ( Fla. App. 5th Dist.2009)).

[44] *Mona Lisa,* 436 B.R. at 190 (citing *Gilmore v. Residences at Sandpearl Resort, LLC,* 2008 WL 4426705, at 1 (M.D. Fla. September 26, 2008); *Taylor* 561 F. Supp.2d at 1271–72 & n. 8; *Bush v. Bahia Sun Associates LP,* 2009 WL 963133, at* 12 (M.D. Fla. April 8, 2009)).

[45] *Mona Lisa* at 189-190.

years of signing Original Purchase Agreements.  Appendix B lists all plaintiffs who filed timely damages claims under ILSFDA.  All other plaintiffs filed their claims *more* than three years after signing their contracts with Mona Lisa.  These plaintiffs' ILSFDA claims are time barred and are listed on Appendix C.

### Defendants Entitled to Summary Judgment
### Barring ILSFDA Claims Brought More than Three Years After Contract Signed

Section 1711(b) of ILSFDA requires that all actions to enforce a right under § 1703 be brought within three years of signing a sales contract.[46] Therefore, defendants are entitled to summary judgment against all plaintiffs who filed their ILSFDA claims *more than three years* after signing their respective contracts because these plaintiffs, listed in Appendix C, are all completely time barred from bringing any ILSFDA claim.

### Defendants Entitled to Summary
### Judgment on all ISLFDA Automatic Rescission Claims

Most plaintiffs signed the earlier form of Mona Lisa's contract, the Original Purchase Agreement. As will be discussed, this version of the contract is not exempt from ILSFDA. However, no plaintiff who signed an Original Purchase Agreement filed a timely claim for automatic rescission within two years of signing the contract. All plaintiffs who brought timely automatic rescission claims signed the Updated Purchase Agreements that are exempt from the ISLFDA. Defendants are entitled to summary judgment as to all plaintiffs' automatic rescission claims, listed in Appendix A.  These plaintiffs may, however, have a valid damages claim under §1711(b), because they brought their claim within three years.

---

[46] 15 U.S.C. § 1711(b).

### Defendants are Entitled to
### Summary Judgment Against All Plaintiffs
### Who Signed Updated Purchase Agreements
### Because the Contracts are Exempt under ILSFDA

Plaintiffs who bring valid causes of action under the ILSFDA *within two years* of signing purchase contracts are entitled to automatic revocation of their purchase contracts, *without proving damages*, as long as their contracts are not exempt from the ILSFDA.[47] As noted, no such plaintiff exists. Plaintiffs who bring ILSFDA claims *within three years* of signing a purchase contract, such as those listed in Appendix B, may recover damages if their contracts are not exempt.

Certain contracts, however, are exempt from ILSFDA, if they provide purchasers of pre-construction condominiums sufficient assurances that protect against real estate fraud.[48] For example, a contract selling an existing home is exempt, presumably because a purchaser can see the house.[49] The buyer is not at risk the developer will take his deposit and fail to build the home. Similarly, a contract for the sale of a lot to a government agency is exempt because the agency generally does not require the same level of consumer protections as an individual consumer.[50] For the same sort of reasons, and most relevant in this dispute, a contract for the sale or lease of land also is exempt from the ILSFDA if it obligates the developer to construct the building

---

[47] *Gentry*, 654 F.3d at 1262.

[48] See *Gentry*, 602 F.Supp.2d at 1248-49 (citing the guidelines for ILSFDA describing certain exemptions: "An exemption is available because of the presence of already completed homes on certain lots that met the requirements of § 1702(a)(2), leaving the remaining lots exempt under the One Hundred Lot exemption. . . . The Guidelines provide another example where certain lots were exempt because they had preexisting residential structures already erected, while others lots were to be sold to contractors or reserved for construction of homes by the developer. The exemption of these lots qualified the remaining lots for the One Hundred Lot exemption." Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13596-01, Part 7010.

[49] 15 U.S.C. § 1702(a)(2).

[50] 15 U.S.C. § 1702(a)(5).

within 2 years.[51] Whether or not construction actually is completed within two years is irrelevant, as long as the obligation is unconditional.[52]

In March 2006, Mona Lisa amended its Original Purchase Agreement to include in Paragraph 3 a promise to complete construction within two years. Pursuant to § 1702(a)(1)(2), these "Updated Purchase Agreements" containing this new two-year construction promise are exempt from the ILSFDA, unless the two-year construction obligation was "adopted for the purpose of evasion."[53]

Plaintiffs make several arguments that Mona Lisa's promise to complete construction within two years was indeed illusory, was included for the sole purpose of evading the statute, and that the Updated Purchase Agreements are not exempt. Specifically, plaintiffs argue the force majeure clause in Paragraph 3, the limitation of remedies clause in Paragraphs 13,[54] the risk of loss provision in Paragraph 24, the title exception provisions in Paragraph 10, and the estimated closing date in Paragraph 2 all work together to make Mona Lisa's promise to complete construction in two years illusory. In the following lengthy analysis, the Court rejects each of these arguments. As a result, the Updated Purchase Agreements are exempt from ILSFDA, and every plaintiff that signed this later agreement cannot bring an ILSFDA claim, period.

In arguing that Mona Lisa inserted the two-year construction requirement into the Updated Purchase Agreement simply to exempt them from ILSFDA, plaintiffs cite to the ILSFDA Guidelines which provide that "any condition which qualifies the obligation to

---

[51] 15 U.S.C. § 1702(a)(2).
[52] *Adams-Lipa v. TDS Town Homes (Phase I) LLC*, 2009 WL 1850267 at *3 (M.D. Fla. June 25, 2009) (citing *Harvey v. Lake Buena Vista Resort, LLC*, 568 F. Supp.2d 1354, 1362 (M.D. Fla. 2008)).
[53] 15 U.S.C. § 1702(b).
[54] Doc. No. 39 at 8 in 9-ap-859.

complete a building within two years nullifies the applicability of the exemption."[55] If Plaintiffs were to read further, however, they would recognize that not all qualifications are impermissible. Even though a contract must provide either specific performances or damages, a legitimate contract defense by its own definition allows a developer to avoid both remedies. The HUD Guidelines clarify this:

> Contract provisions which allow for nonperformance or for delays of construction completion beyond the two-year period are acceptable if such provisions are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected. For example, provisions to allow time extensions for events or occurrences such as acts of God, casualty losses or material shortages are generally permissible.
> . . .
> Although the factual circumstances upon which nonperformance or a delay in performance is based may vary from transaction to transaction, as a general rule delay or nonperformance must be based on grounds cognizable in contract law such as impossibility or frustration and or events which are beyond the seller's reasonable control.[56]

A contractual provision renders an obligation "illusory" only when it allows a party "to breach with impunity."[57] However, "allowing for reasonable delays caused by events beyond the seller's control do not . . . transform the seller's obligation into an option. . . . The question is whether [the contractual provision] allows nonperformance by the seller at the seller's sole discretion."[58] The ILSFDA does not require developers to waive all legitimate contract defenses to avoid inclusion in ILSFDA, but, instead, requires that the reason for the developer's non-performance arises from a source outside of the developer's control.

---

[55] Guidelines for Exemptions under the Interstate Land Sales Full Disclosure Act, 44 Fed.Reg. 24.010, 24.012 (1979).

[56] *Id.*

[57] *Stein,* 586 F.3d at 858 (citing *Port Largo Club, Inc. v. Warren,* 476 So.2d 1330, 1333 (Fla. App. Dist. 3d. 1985)). Impunity means "an exemption or protection from punishment." BLACK'S LAW DICTIONARY 774 (8th Ed. 2004).

[58] Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13,596 (Mar. 27, 1996) (emphasis added); *Stein,* 586 F.3d at 858 (citing *Atteberry v. Maumelle Co.,* 60 F.3d 415, 420 (8th Cir. 1995)).

### The Force Majeure Clause Does Not
### Make the Two-Year Completion Deadline Illusory

In the Updated Purchase Agreements, plaintiffs first point to Paragraph 3, containing the force majeure provisions, which provides:

> **3. *Completion of Unit.*** Seller shall cause the construction of the Condominium and the Unit to be completed within a period of two (2) years from the date Purchaser signs this Contract. The date for completion of such construction may not be extended by the Seller for any reason other than delays caused by circumstances beyond Seller's control, such as acts of God, or other grounds cognizable in Florida contract law as impossibility or frustration of performance . . . .[59]

The first sentence of Paragraph 3 obligates Mona Lisa to finish construction of plaintiffs' units within two years of signing their respective purchase agreements. Plaintiffs, however, argue that the second sentence—the force majeure clause—renders illusory the promise to complete construction.

The force majeure clause is appropriate and does not render Mona Lisa's performance discretionary.  In a binding decision, the Eleventh Circuit Court of Appeals has held that a clause excusing performance due to conditions out of the developer's control does not make the promise to perform "illusory" or preclude a contract from the § 1702(a)(2) exemption.[60] Even a force majeure clause that includes foreseeable, as well as unforeseeable, events is permissible.[61] And, under *Stein,* a contract can be exempt from ILSFDA even if the two-year obligation to complete construction is subject to the provision that "delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the Unit is being

---

[59] Doc. 125 Exhibit 7.

[60] *Stein v. Paradigm Mirasol, LLC,* 586 F.3d 849 (11th Cir.2009) (clause stated that "... Seller shall not be responsible for any delay caused by acts of God, weather conditions, restrictions imposed by any governmental agency, labor strikes, material shortages or other delays beyond the control of the seller ..."); *see also Rondini v. Evernia Properties, LLLP,* 2008 WL 793512, No. 07–81077–CIV (S.D. Fla. Feb. 13, 2008).

[61] *Stein,* 586 F.3d at 857–58; *see also Kamel v. Kenco/The Oaks at Boca Raton LP,* 321 Fed. Appx. 807 (11th Cir. 2008).

constructed."[62] Moreover, the conditions on the two-year construction obligation need not be limited to excuses that fall within the doctrine of impossibility.[63] Florida courts recognize both impossibility and frustration as excuses to a breach of contract claim.[64] In Florida, a sales contract containing a force majeure clause subject to recognized excuses for performance under state law still qualify for the § 1702(a)(2) exemption.[65]

Virtually ignoring these recent decisions, plaintiffs cite a 20–year–old decision of the Florida Supreme Court for the proposition that *any* conditions restricting the two-year obligation are impermissible.[66] First, *Samara* is contrary to the recent binding decisions of the Eleventh Circuit, just discussed. Second, Florida appellate courts repeatedly have limited *Samara's* reach.[67] For example, the Second District Court of Appeals has held "acts of God, impossibility of performance, and frustration of purpose are well-recognized defenses to nonperformance of a contract" under Florida law, and that "well-recognized defenses to contractual non-performance" do not render the two-year obligation illusory.[68] More specifically, a Florida appellate court recently held that, despite *Samara,* a force majeure clause that includes conditions beyond the

---

[62] *Van Hook v. the Residences at Coconut Point, LLC,* 364 Fed. Appx. 549 (11th Cir. 2010).

[63] *Aikin v. WCI Communities, Inc.,* 26 So.3d 691, 697 (Fla. App. Dist. 2d 2010); see also *Jankus v. Edge Investors, L.P.,* 650 F.Supp.2d 1248, 1255–56 (S.D. Fla.2009).

[64] The two doctrines are interrelated. Impossibility "refers to those factual situations, too numerous to catalog, where the purposes, for which the contract was made, have, on one side, become impossible to perform." *Crown Ice Machine Leasing Co. v. Sam Senter Farms, Inc.,* 174 So.2d 614, 617 (Fla. App. Dist. 2d 1965). Frustration arises when "one of the parties finds that the purpose for which he bargained, and which purposes were known to the other party, have been frustrated because of the failure of consideration, or impossibility of performance by the other party." *Crown Ice Machine Leasing Co. v. Sam Senter Farms, Inc.,* 174 So.2d 614, 617 (Fla. App. Dist. 2d 1965).

[65] *Ryan v. WCI Communities Inc.,* 2008 WL 2557541, No. 3:08cv4/MCR (N.D. Fla. June 23, 2008); *Gentry v. Harborage Cottages–Stuart, LLLP,* 602 F.Supp.2d 1239, 1245 (S.D. Fla.2009); *Snavely Siesta Assocs., LLC, v. Senker,* 34 So.3d 813 (Fla.2010).

[66] *Samara Dev. Corp. v. Marlow,* 556 So.2d 1097 (Fla. 1990). Plaintiffs also cite to two other distinguishable cases. In *Schatz v. Jockey Club Phase III, Ltd.* 604 F. Supp. 537, 541–42 (S.D. Fla. 1985), the contractual provision specifically stated buyers had no remedy if the developer failed to complete construction on time. In *Dorchester Development,* 439 So.2d 1032 (Fla. App. Dist. 3d 1983), the contractual provision never promised a completion date but instead gave buyers an option to cancel the contract if construction was not finished within two years. Neither contract imposed a binding two-year completion commitment on the developer and are not persuasive.

[67] *See, e.g. Hardwick Properties, Inc. v. Newbern,* 711 So.2d 35, 39–40 (Fla. App. Dist. 1st 1998).

[68] *Aikin v. WCI Communities, Inc.,* 26 So.3d 691, 697 (Fla. App. Dist. 2d 2010), quoting *Mailloux v. Briella Townhomes, LLC,* 3 So.3d 394, 396 (Fla. Dist. Ct. App. 4th 2009); see also *Snavely Siesta Assocs., LLC v. Senker,* 34 So.3d 813 (Fla. 2010) (force majeure clause limited to impossibility or frustration of purpose does not preclude a sales contract qualifying for the § 1702(a) exemption).

seller's control does not render the two-year obligation illusory.[69] Similarly, here, Paragraph 3 of the Updated Purchase Agreements, which only limited the two-year commitment to circumstances beyond Mona Lisa's control, imposed a binding, non-illusory commitment on Mona Lisa to complete construction within two years of signing the agreements, which causes the contracts to be exempt from the ILSFDA.

### The Two-Year Completion Deadline was Not Inserted to Evade ILSFDA

Plaintiffs next argue that Mona Lisa added the two-year completion requirement of Paragraph 3 to "evade" compliance with the statute. Under ILSFDA, an exemption will not apply if the mechanism for qualifying for the exemption was "adopted for the purpose of evasion."[70] Although not all courts follow the Eighth Circuit's requirement to show *fraudulent* intent in evading the statute,[71] a developer does not evade the statute merely by taking "conscious action to ensure a [development] meets the requirements of one or more exemptions that are explicitly provided in the statute." [72] As one court recently found, "the mere fact that a developer structures the sale of a subdivision in a way that makes the project exempt from the [ILSFDA] is not, without more, sufficient to conclude that the seller has taken such actions for the purpose of evading the [ILSFDA]'s requirements."[73]

In the Eleventh Circuit, a developer seeking an exemption from the ISLFDA must "produce factual evidence demonstrating that the method of disposition has a real world objective that manifests a legitimate business purpose. The 'legitimate business purpose' standard asks the party invoking the exemption to articulate some legitimate business reason for

---

[69] *Home Devco/Tivoli Isles, LLC v. Silver,* 26 So.3d 718, 723 (Fla. App. Dist. 4th 2010).
[70] 15 U.S.C. § 1702(a).
[71] *Gentry,* 602 F.Supp.2d at 1247–48 (disagreeing with the 8th Circuit's holding in *Atteberry,* 60 F.3d at 421 (8th Cir. 1995) that a plaintiff must make a showing of fraudulent intent to evade the statute).
[72] *Bodansky v. Fifth on the Park Condo, LLC,* 732 F. Supp.2d 281, 292 (S.D.N.Y. January 29, 2010).
[73] *Gentry,* 654 F.3d at 1257 (citing *Gentry,* 602 F. Supp.2d at 1247).

its method of disposition other than the avoidance of the ILSFDA's consumer protections."[74] A developer has the burden of demonstrating that evading the ILSFDA is not the *sole* reason for seeking an exemption.[75] This is not a heavy burden.[76] For example, a developer can prove a legitimate business purpose by proving it sought an exemption to reduce project costs.[77] A defendant can also meet this low threshold by submitting a company officer's affidavit stating that using ILSFDA allowed for greater flexibility in developing the project and saved the company time and money.[78]

In this case, Mona Lisa has asserted a legitimate business purpose for including the two-year commitment to complete construction. William Haberman, a managing member of Mona Lisa, states in his affidavit that Mona Lisa's construction lender, BankFirst, required the contracts to include the provision in order to invoke ILSFDA's exemption.[79] Mona Lisa took a conscious action to qualify for one of the exemptions permitted under ILSFDA because the debtor could not get funding without the exemption. The Court thus finds that Mona Lisa did not "evade" the statute by adding the two-year commitment to finish construction.[80]

### The Limitation of Remedies Provision
### Does Not Make the Two-Year Completion Deadline Illusory

Plaintiffs next point to Paragraph 13 of the Updated Purchase Agreement, which limits plaintiffs' available remedies, as a further proof that Mona Lisa's promise to complete construction within two years was illusory. Paragraph 13 reads as follows:

---

[74] *Gentry*, 654 F.3d at 1257.
[75] *Id* at 1259.
[76] *Id*.
[77] *Double AA Int'l Investment Group, Inc. v. Swire Pacific Holdings, Inc.*, 674 F. Supp.2d 1344, 1355 (S.D. Fla. 2009).
[78] *Swire*, 674 F.Supp.2d at 1355.
[79] Doc. No. 125, ¶ 20.
[80] As an aside, the Court notes that adding Paragraph 3 did not simply exempt Mona Lisa from ILSFDA. The provision imposed an additional burden on Mona Lisa to complete construction within two years providing greater protections for buyers by mandating completion within a relatively short period of time.

> **13. *Seller's Default.*** If Seller fails to perform Seller's obligations under this Contract, then Purchaser shall have the right to terminate this Contract and receive a full refund of all Deposits and moneys paid by Purchaser hereunder, together with any accrued interest thereon, and Purchaser shall have the right to pursue claims for specific performance or damages.[81]

Under recent binding Eleventh Circuit precedent, limiting buyers' remedies to deposit refunds and damages *or* specific performance, as Paragraph 13 does here, does not make a builder's two-year completion promise "illusory."[82] Even prior to *Stein*, federal district courts in the Southern District of Florida[83] and Florida state courts[84] reached the same conclusion.

In this case, if Mona Lisa defaults, the buyers have the right to specific performance or damages *and* the right to terminate the contract and receive a full refund of all deposits paid.[85] The purchase agreements do not limit the kind of damages plaintiffs could recover. This differs from the contract in *Stein*[86] which limited damages to "actual and direct damages." Yet, even in that case, the Eleventh Circuit found the developer's obligation to perform under the contract was not illusory. In short, there is little support for plaintiffs' argument. Accordingly, the Court finds that the remedies listed in Paragraph 13 of the Updated Purchase Agreements did not render illusory Mona Lisa's obligation to complete construction within two years.

### The Risk of Loss Provision Does Not
### Make the Two-Year Completion Deadline Illusory

Plaintiffs next argue Paragraph 24 of the Updated Purchase Agreements governing incidences of casualty impermissibly qualify the two-year construction obligation by giving Mona Lisa the option of nonperformance. Paragraph 24 reads:

---

[81] Doc. No. 125 Exhibit 7.
[82] *Stein*, 586 F.3d 849 (11th Cir.2009).
[83] *Barry v. Midtown Miami No. 4, LLC*, 651 F.Supp.2d 1320, 1324 (S.D.Fla.2008); *Rondini v. Evernia Properties, LLLP*, 2008 WL 793512, No. 07–81077–CIV (S.D. Fla. Feb. 13, 2008).
[84] *See, e.g., Hardwick Properties, Inc. v. Newbern*, 711 So.2d 35, 39–40 (Fla. App. Dist. 1st 1998).
[85] Doc. No. 127 Exhibit 7, at 6.
[86] 586 F.3d 849 (11th Cir.2009).

> **Risk of Loss Prior to Closing.** Any loss and/or damage to the Condominium Property, the Unit or the common elements between the Effective Date of this Contract and the closing will be at the Seller's sole risk and expense. Seller shall have the right to elect to repair such damage or destruction . . . . If Seller does not elect to repair the damage or destruction, this Contract shall be terminated and all Deposits made by Purchaser hereunder shall be refunded to Purchaser, whereupon the parties here to shall be released from all liability hereunder to one another"[87]

Florida courts interpret casualty provisions like the one above as legitimate contract defenses because the developer's election not to repair is limited to circumstances beyond a developer's control.[88] Interpreting the Updated Purchase Agreements as a whole,[89] the casualty provision is constrained by the requirement in Paragraph 3 that construction of the project may only be extended for legitimate contract defenses and circumstances beyond a Seller's control.[90] Accordingly, damage and destruction to the property so severe that it would give Mona Lisa the election not to repair would qualify as a legally cognizable defense to contract. Paragraph 24 therefore does not render Mona Lisa's two-year construction obligation illusory.

### The Title Exception Provision Does Not Make the Two-Year Completion Deadline Illusory

Plaintiffs point to Paragraph 10(b) of the Updated Purchase Agreement that outlines the developer's obligation for curing title defects to show Mona Lisa's two-year construction deadline is illusory. Paragraph 10(b) provides:

---

[87] Doc. No. 125 Exhibit 1, at ¶ 24.

[88] *Adams-Lipa,* 2009 WL 1850267 at *4–5. Against the weight of authority, plaintiffs rely on *Dazlezz v. Trailhead,* a District of Colorado case that found a similar casualty provision rendered the purchase contract illusory. Doc. No. 39 at 9–10 in 9-ap-859 (citing *Dazlezz v. Trailhead,* 2010 WL 3843464 (D. Colo. Sept 27, 2010)). The developer agreed to construct within two years, but the case does not clarify whether any provision included an out for "recognizable contract defenses." *See Adams-Lipa,* 2009 WL 1850267 at *4–5, See also Stein* 586 F.3d at 849 (noting that because the clause "or any other similar causes not within Seller's control" follows events listed before it—events which provide a recognized defense to a claim for contractual breach under Florida law—the clause can be construed as covering only events which are beyond the seller's control).

[89] RESTATEMENT OF CONTRACT § 235(c) (1932): Rules Aiding Application of Standards of Interpretation ("A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together*"); Antar v. Seamiles,* LLC, 994 So2d 439 (Fla. App. Dist. 3d. 2008) (citing *Gen. Star Indem. Co. v. W. Fla. Vill. Inn, Inc.,* 874 So.2d 26, 30 (Fla. App. Dist. 2d 2004) for the proposition that in general contract law a "court must read a contract 'as a whole, endeavoring to give every provision its full meaning and operative effect," and that a single contract provision "should not be considered in isolation, but rather, the contract shall be construed according to the entirety of its terms'").

[90] *See Stefan v. Singer Island Condominiums Ltd.,* 2009 WL 426291 (S.D. Fla. Feb. 20, 2009).

> **Title**. Purchaser shall have five (5) days . . . to notify Seller in writing of any objection(s) to matters of title that are *not Permitted Exceptions* and would render title to the Unit unmarketable. . . . If any objections(s) made by Purchaser would render title unmarketable, Seller shall have ninety (90) days after receipt of notice of the objection(s) to title to cure same, *but Seller is not obligated to do so*. If Seller cannot or elects not to cure such objection(s) within the ninety (90) day period, Purchaser shall elect one of the following options…[91]

Under this provision, a buyer has two choices. He can accept title as-is without a reduction in the purchase price or he can terminate the contract and receive a full refund of all deposits and accrued interest, waiving all claims against the Seller, and agreeing that "Seller shall not be liable to Purchaser for damages as a result of Seller's inability or unwillingness to cure any title objection(s) that render title unmarketable."[92] The definition of "Permitted Exceptions" includes a laundry list of those things normally found on a seller's title that are customary, immaterial, "or matters that would not normally interfere with the use of the Unit for its intended purpose or will be cured by application of the Purchase Price or other funds of Seller…"[93]

This provision in Paragraph 10(b) is similar to the title clause in the purchase contracts in *Stefan v. Singer Island Condos, Ltd.*[94] In that case, the court read the developer's two-year construction obligation together with a similar title provision and found the provision did not render the two-year construction commitment illusory. The court based its findings on a severability clause that restricted the seller's remedies to only those that did not extend the seller's completion obligation beyond the two-year period.[95]

---

[91] Doc. No. 125 Exhibit 7 at ¶ 10(b).

[92] *Id.*

[93] Doc. No. 125 Exhibit 7, at Section 10(c).

[94] *Stefan*, 2009 WL 426291 at *2 ("Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement by a date no later than two (2) years from the date Buyer signs this Agreement, subject, however, only to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the Building is being erected.").

[95] *Stephan*, 2009 WL 426291 at *8.

Further, Paragraph 10(b) is distinguishable from the clause at issue in *Dorchester*[96] because, according to the definition of "Permitted Exceptions," the only situations that trigger Mona Lisa's nonperformance arise from title defects that are either unfeasible to correct or unanticipated by either party.[97] If Mona Lisa failed to cure a title defect that was not a Permitted Exception, i.e., it was anticipated or easy to correct, plaintiffs would have a breach of contract claim under Paragraph 13.

Paragraph 10(b) does not allow Mona Lisa to avoid its obligation to complete construction within two years. Rather, the title provision in the Updated Purchase Agreement only gives Mona Lisa an escape clause in the event unanticipated or unfixable title defects arise. Construction may not be extended by the seller *for any reason* other than circumstances beyond seller's control. Paragraph 10(b) does not make the two-year completion deadline illusory.

### The Estimated Closing Date Does Not Make the Two-Year Construction Deadline Illusory

Plaintiffs lastly claim the "Estimated Closing Date" in Paragraph 2 contradicts the absolute two-year construction obligation in Paragraph 3, rendering it illusory, or at least ambiguous, in which case the agreement should be interpreted against the drafter.[98] The relevant part of Paragraph 2 reads:

> Purchaser acknowledges that the Unit and the Condominium improvements of which it is a part have not yet been constructed, and that the Estimated Closing Date is Seller's good faith estimate of a date when construction shall be completed, a certificate of occupancy can be obtained, and possession can be delivered.

---

[96] *Dorchester*, 439 So.2d 1032, 1034.
[97] See RESTATEMENT OF CONTRACTS § 265 Discharge by Supervening Frustration: ("Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.").
[98] Doc. No. 61 at ¶35 in 9-ap-859.

The Estimated Closing Dates in the Updated Purchase Agreements all occur before the end of Mona Lisa's two-year obligation to complete construction. If Mona Lisa failed to actually close by its Estimated Closing Date, which it did, the contracts permit extensions beyond two years only for reasonable defenses to contract and circumstances beyond seller's control. Mona Lisa's good faith estimate to close within a certain time frame in Paragraph 2 does not render the two-year construction obligation illusory.[99]   That is, the only reasons Mona Lisa could extend the estimated closing date are the same exact reasons it could exceed the two-year completion deadline—for circumstances out of its control. The Updated Purchase Agreements are exempt from ILSFDA pursuant to §1702(a). As such, plaintiffs who signed Updated Purchase Agreements have no causes of action under ISLFDA regardless of when their claims were filed. Defendants are entitled to summary judgment as to Counts I – IV against all plaintiffs who signed Updated Purchase Contracts. A list of all plaintiffs who signed an Updated Purchase Agreement is attached as Appendix D.[100]

### Mona Lisa's Failure to Provide Notices Required by §1703 (a), (b), and (d) of ILSFDA Caused Plaintiffs No Actual Damages

After concluding that no plaintiff has an automatic right to rescind the purchase agreement under ILSFDA, that any plaintiff who filed a claim more than three years after signing the purchase agreement is time barred from bringing an ILSFDA claim, and that any plaintiff who signed an Updated Purchase Agreement has no ILSFDA claim, the only remaining plaintiffs with ILSFDA claims are those who signed Original Purchase Agreements and who filed a claim within three years of signing the contract.  A list of these plaintiffs is attached as Appendix E.

---

[99] *Van Hook v. the Residences at Coconut Point, LLC,* 364 Fed. Appx. 549 (11th Cir. 2010).
[100] Some of these plaintiffs are listed in Appendix A as plaintiffs who filed automatic rescission claims within two years of signing their Updated Purchase Contracts.

Because ILSFDA does not provide for statutory damages,[101] these remaining plaintiffs are required to prove *actual* damages.

Consistent with the law of the Eleventh Circuit, this Court rejects plaintiffs' bald contention that "proof of loss causation is simply not required under ILSFDA."[102] *Gentry* held that if a purchaser fails to revoke a contract before two years expire, a court may award damages if a plaintiff proves he was harmed by a developer's ILSFDA violation and brings a claim within three years of signing a purchase contract.[103] The ILSFDA also "permits a purchaser to obtain the deposit as an *equitable* remedy if the purchaser shows that the remedy is justified by the *facts of a specific case*."[104] Rescission also is an appropriate equitable remedy "if a plaintiff can show that he or she was *actually harmed* by the statutory violations or by the developer's failure to provide the required notices."[105] Even though, as plaintiffs argue, the "remedies of rescission and damages [may] have the same result, namely to return the Plaintiff's deposit money,"[106] different levels of proof apply.   Plaintiffs who fail to take advantage of their two-year automatic "no questions asked" rescission rights instead must prove actual damages to recover a refund of their deposits if they wait more than two years to seek rescission.

To show actual damages, plaintiffs must allege that Mona Lisa's failure to provide them with required disclosures caused them actual harm and that they are entitled to compensation for

---

[101] *Mona Lisa,* 436 B.R. at 192 (citing 15 U.S.C. 1709(a)).

[102] Doc. No. 39 at 13–14 in Case No. 9-ap-859 (arguing "[d]efendant fails to understand the strict liability nature of the ILSFDA.").

[103] *Gentry,* 654 F.3d at 1262.

[104] *Gentry,* 654 F.3d at 1262 (Citing *Murray v. Holiday Isle*, 620 F. Supp. 1302, 1312 (S.D. Ala. 2009) ("where a purchaser has been damaged by nondisclosure of these rescission rights as required by § 1703(c), the purchaser plainly has an actionable ISLFDA claim pursuant to § 1709(b)."). Plaintiffs erroneously cite to *Schatz* and *Application Inc.* to show loss causation is not required. *Schatz v. Jockey Club Phase III, Ltd.,* 604 F. Supp. 537 (S.D. Fla. 1985); *Appalachian, Inc. v. Olson,* 468 So.2d 266 (Fla. App 2d Dist. 1985). In both cases the courts granted plaintiffs' rescission requests without addressing whether or how the plaintiffs were damaged. These dated cases lack an abundance of facts and are distinguishable because they simply fail to address ILSFDA's various statutes of limitation or even mention when plaintiffs brought their causes of action.

[105] *Venezia v. 12th & Division Properties, LLC,* 679 F. Supp.2d 842, 850 (M.D. Tenn. 2009) (emphasis added).

[106] Doc. No. 61 at ¶ 17 in Case No. 9-ap-859.

their injury. In their pleadings, plaintiffs have alleged their deposits constitute actual damages as a result of Mona Lisa's failures, but they do not explain why or how they were injured. Plaintiffs also argue in the alternative that, even if proof of damages is required, they have proven they were harmed by alleging they would have revoked their contracts had they been given the appropriate disclosures.[107]

Defendants insist that plaintiffs cannot show actual damages because plaintiffs received numerous disclosures similar to what would have been provided in the property report and nothing in the property report or the other required disclosures, had they been provided, would have changed plaintiffs' minds about purchasing a hotel-condominium unit.[108] Because defendants argued in their motion for summary judgment that plaintiffs cannot show the debtor's failure to provide the property report caused plaintiffs any harm, plaintiffs, under Rule 56(e), then had the burden to produce some facts or evidence to support their claim.[109] Instead, plaintiffs have merely repeated their assertion that had they received the property report information they would have revoked the applicable contract.

The plaintiffs' bare allegations that they would have changed their mind if Mona Lisa had given them the required disclosures is devoid of any basis in fact and is not enough to meet plaintiffs' burden of production in responding to defendants' summary judgment motion. Plaintiffs were required to demonstrate *with specific facts* how the information they did not receive would have altered their decision to pay deposits to Mona Lisa for their respective hotel-condominium units. On summary judgment, when defendants raised a credible doubt as to whether plaintiffs could prove actual damages, plaintiffs are required to show much more than

---

[107] Doc. No. 39 at 13 in 9-ap-859.

[108] Doc. No. 126, at 22–23.

[109] Under Rule 56(e), the nonmoving party, in responding to a properly made motion for summary judgment, "may not rely merely on allegations or denials in its own pleadings; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. Pro. 56(e).

these types of conclusory allegations. Because they have not done so, plaintiffs' damages claims must fail.

Plaintiffs specifically allege numerous disclosure violations under ILSFDA: (1) Mona Lisa failed to provide a property report required by §1703(a)(1); (2) Mona Lisa failed to provide a lot description required by §1703(d)(1); (3) Mona Lisa failed to provide a disclosure relating to future roads and utility services as required by §1703(a)(2); (4) Mona Lisa failed to provide disclosures relating to the plaintiff's right to cure contract breaches or, that upon a breach, Mona Lisa was entitled to retain up to 15% of the purchase price as required by §1703(d)(2 and 3); and (5) Mona Lisa failed to disclose a seven-day revocation right as required by §1703(b). Yet, not a single plaintiff offers any factual proof other than to recite in a rote fashion that, if given the disclosure, they would not have signed the contract.

The likely reason the plaintiffs rely on these conclusory statements is that they cannot demonstrate any actual damages because, by and large, Mona Lisa did everything it promised. Mona Lisa completed construction. The project has the exact same road, pool, suites, bathrooms, kitchens, and utilities contained on the numerous maps and promotional materials each of the plaintiffs received. Indeed, many purchasers in the same situation as the plaintiffs closed on their units and are now enjoying the amenities of the project.

Perhaps even more telling is the plaintiffs' argument that Mona Lisa did not disclose a seven-day revocation right as required by §1703(b). They are correct. Mona Lisa did not give them just seven days to revoke the contract. Mona Lisa gave them *fifteen* days as required by the Florida Condominium Act.[110] The plaintiffs cannot with a straight face argue they were harmed when Mona Lisa gave them twice as long a time to decide whether to revoke the contract.

---

[110] *See* Doc. No. 125, Exhibit 7 (Original Purchase Agreement notices in bold just before signature block).

The ILSFDA's seven-day revocation provision "is a general buyer's remorse provision"[111] which allows a purchaser to revoke a purchase contract during the seven days following the signing of a sales contract.[112] Similarly, Florida's fifteen-day revocation right is Florida's version of a buyer's remorse provision and provides for a "cooling off period to protect the public in general from high pressure condominium sales situations."[113]

Plaintiffs argue this fifteen-day right given by Florida law is insufficient to comply with the seven-day revocation requirements under §1703(b) of ILSFDA because it restricts a buyers' rights by requiring written notice, whereas the disclosure required under § 1703(b) has no such limitation.[114] Plaintiffs rely on *Werdmuller Von Elgg v. Paramount,* where the court granted plaintiffs a refund because a purchase contract failed to include a seven-day right to revoke, even though it included Florida's mandatory fifteen-day revocation notice under § 718.503.[115] *Werdmuller*, which did not discuss damages but simply refunded a deposit, was decided before the Eleventh Circuit clarified that plaintiffs who bring ILSFDA claims after two years, but within three years, of signing a purchase agreement, must prove actual damages in order to recover for an ILSFDA violation.

In this case, plaintiffs were on notice they could cancel their contracts within fifteen days of signing the purchase contracts.  None of them pursued this option.  Plaintiffs do not explain how the written notice requirement in § 718.503 under Florida law prevented them from

---

[111] Doc. No. 61 at ¶ 21 in 9-ap-859 (citing *Ditthardt v. North Ocean Condos, L.P.,* 580 F. Supp.2d 1288, 1291 (S.D. Fla. 2008)).  The Court, however, rejects the finding that § 1703(b) comes with an automatic three-year rescission right.

[112] 15 U.S.C. § 1703(b).

[113] *Pretka v. Kolter City Plaza II, Inc*, 2011 WL 841513, *4 (S.D. Fla. March 7, 2011). Fla. Stat. § 718.503 reads:
> THIS AGREEMENT IS VOIDABLE BY PURCHASER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF THE EXECUTION OF THIS CONTRACT BY THE BUYER, AND RECEIPT BY THE BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO PURCHASER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES.

[114] Doc. No. 61 at ¶11 in 9-ap-859.

[115] *Werdmuller Von Elgg v. Paramount*, No. 6:08-CV-1285-KRS (M.D. Fla. 2008).

asserting their longer fifteen-day right to cancel. Nor do they make any factual allegations as to

why, after seven days, they all would have cancelled their agreements based on buyer's remorse.

Nevertheless, they argue that they would have revoked had they been informed of their shorter,

seven-day oral revocation right in § 1703(b). Plaintiffs' only claim of damages comes from their

affidavits stating they were:

> "unaware of their rescission and revocation rights under the ILSFDA, and the
> contract did not disclose such rights. Specifically, I was unaware that I had a
> right to revoke the contract within 2 years after the date I signed the contract, and
> I was unaware that I had a right to revoke the contract until midnight of the 7th
> day after signing the contract. If Mona Lisa had disclosed in the contract my
> right to revoke and rescind, I would have revoked and rescinded the contract
> within the time provided by the ILSFDA."[116]

Plaintiffs' arguments, that they all would have revoked within seven days had they known they

could do so verbally, are unconvincing and unsubstantiated by facts.  Defendants are entitled to

summary judgment as to those plaintiffs who signed Original Purchase Agreements and timely

filed damage claims within three years to the extent that they assert damages arising from Mona

Lisa's failure to provide disclosures required by §1703(a),(b), or (d) of ILSFDA.

### Material Factual Disputes Preclude Summary Judgment as to Mona Lisa's
### Failure to Prove Notice of Plaintiffs' Two-Year Revocation Rights under § 1703(c)

Plaintiffs next allege they were harmed by Mona Lisa's failure to include notice of

plaintiffs' two-year revocation right in the Original Purchase Contracts, as required under §

1703(c).[117] If, as in this case, plaintiffs have failed to automatically revoke their purchase

contracts within two years of signing them, they have an additional year to file a claim to assert

---

[116] See plaintiffs' affidavits, for example, in Doc. Nos. 58–61 in 9-ap-770. Some affidavits claim "We were unaware of our 15 U.S.C. § 1703(c) rescission right and the Purchase Agreement fails to disclose such right as required." Doc. Nos. 55–75.

[117] 15 U.S.C. § 1703(c) reads:

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is
> required by this chapter and the property report has not been given to the purchaser or lessee in
> advance of his or her signing such contract or agreement, such contract or agreement may be
> revoked at the option of the purchaser or lessee within two years from the date of such signing,
> and such contract or agreement shall clearly provide this right.

they were damaged by a developer's failure to disclose this right. Mona Lisa does not dispute that the purchase contracts do not contain the required two-year revocation disclosure but argues that plaintiffs were not harmed by this mistake.

In the Eleventh Circuit, plaintiffs can prove they were harmed by a developer's failure to notice the two-year revocation right by providing specific evidence of causation.[118] In *Gentry*, the Eleventh Circuit Court of Appeals granted purchasers the return of their deposits as damages because they swore that they would have timely revoked their contracts had they been aware of their rights to do so.[119]

Two prior decisions by the United States District Court for the Middle District of Florida, *Harari* and *Kiertz,* came to the same conclusion.[120] In both cases, the district court found a developer liable for failing to provide purchasers with notice of their two-year rights of revocation in their contracts, holding that a plaintiff may recover damages for failing to disclose a rescission right "if she can establish that (a) the defendant did not tell her of her right to rescind, (b) she did not know of her right to rescind until after the two-year rescission period had expired, (c) she would have timely exercised her rescission option had the defendant informed her of same as the ILSFDA required it to do, and (d) she has incurred damages as a result of her inability timely to exercise her rescission option."[121] Accordingly, the district court found the plaintiffs were entitled to damages for the developer's failure to provide notice of their two-year revocation rights because failure to provide the notice *proximately* caused their damages in the amount of their contract deposits.

---

[118] *Gentry*, 654 F.3d at 1262–63. ); *Harari v. Seymour Int'l, Inc.*, Case No. 6:09–cv–1277–Orl–22–ACC–GJK (Doc. No. 25);

[119] *Gentry*, 654 F.3d at 1262–62.

[120] The Court previously rejected the analysis from these two cases because plaintiffs cited the cases for a separate provision of the ILSFDA. *Mona Lisa*, 436 B.R. at 192–93 (citing *Harari v. Seymour Int'l, Inc.*, Case No. 6:09–cv–1277–Orl–22–ACC–GJK (Doc. No. 25); *Kiersz v. Seymour Int'l, Inc.*, Case No. 6:08–cv–1664–ACC–GJK (Doc. No. 44)).

[121] *Harari*, 6:09–cv–1277 at 7 (citing M*urray v. Holiday Isle*, 630 F. Supp. 2d. 1302 (S.D. Ala. 2009)).

In *Harari* and *Kiersz*, as in *Gentry*, the developer accepted deposits from buyers and then failed to timely complete construction as promised. The plaintiffs in *Gentry* argued the developer misrepresented the quality and scope of the development as promised.[122] In *Harari* and *Kiersz*, construction of the plaintiffs' units took much longer than the plaintiffs anticipated.[123] The two-year automatic rights of revocation in §1703(c) was relevant in these cases because, as construction of the condominium units continued, the plaintiffs identified factors that would have caused them to revoke their contracts within two years had they known they could. Instead, because these plaintiffs lacked notice of their automatic revocation rights, they missed the opportunity.

This case has similar facts. Mona Lisa failed to include notice of plaintiffs' two-year automatic right to revoke in the contracts. Plaintiffs all claim in affidavits that they would have revoked their contracts within two years had Mona Lisa disclosed this right.[124] Plaintiffs' claims are plausible, considering the extensive delays in construction.  Mona Lisa completed construction approximately one year later than promised. After Mona Lisa failed to close on the estimated closing date, plaintiffs would have had at least some time before two years passed to consider revoking their contracts had they known of their right to do so. As such, plaintiffs who signed Original Purchase Agreements and brought timely damage claims within three years of signing their contracts have established they were damaged by Mona Lisa's failure to disclose their two-year automatic revocation right.

Genuine issues of fact preclude summary judgment on this claim, however, because the Court has not yet determined whether the units are "lots," and thus whether Mona Lisa is subject

---

[122] *Gentry v. Harborage Cottages-Stuart, LLLP*, 602 F. Supp.2d 1239, 1243 (S.D. Fla. 2009).
[123] *Harari*, (Doc. No. 25); *Kiersz*, (Doc. No. 44)). In both cases, the plaintiffs make the claim that the developer failed to complete construction within two years.
[124] Doc. No. 61 in 9-ap-859, among other places. Mona Lisa counters that "plaintiffs' identical declarations that they should have rescinded had they known of these rights amount to nothing more than the restatement of the bald allegations of their Complaint with no supporting facts."

to *any* of the provisions in the ILSFDA. Material factual disputes preclude a determination of whether the units are or are not "lots." As such, neither party is entitled to summary judgment on Mona Lisa's failure to comply with § 1703(c) as a matter of law.

## Summary Judgment Rulings on ILSFDA Claims (Counts I – IV)

Defendants are entitled to summary judgment against all plaintiffs who brought ILSDFA claims after three years of signing their purchase agreements because all these plaintiffs are time barred. Defendants also are entitled to summary judgment as to all plaintiffs who signed Updated Purchase Agreements because their contracts are exempt from the ILSFDA. As to the plaintiffs who signed Original Purchase Agreements and brought damage claims within three years of signing the contract, (1) they have no automatic rescission claim because no plaintiff brought an ILSFDA claim within two years; (2) defendants are entitled to summary judgments for all damage claims brought under §1703 (a), (b), and (d) because the plaintiffs have failed to show any actual harm caused by Mona Lisa's failure to make the required disclosures; and (3) neither party is entitled to summary judgment for damage claims under §1703(c) because material factual disputes exist as to whether the "units" are "lots" covered by ILSFDA.

## Mona Lisa Did Not Violate
## Federal or State Securities Laws (Counts V and VI)

In Count V, plaintiffs allege that the hotel-condominium units they purchased from Mona Lisa were unregistered securities under § 77e of the Federal Securities Act of 1933.[125] Likewise, in Count VII, plaintiffs allege Mona Lisa violated the Florida Securities and Investor Protection Act ("FSIPA") by selling unregistered securities.[126] Because FSIPA parallels almost exactly the 1933 Securities Act, the Court's analysis under the federal statute also determines the outcome under FSIPA.

---

[125] 15 U.S.C. § 77a, *et seq.*
[126] Fla. Stat. § 517.011, *et seq.*

Under § 77e of the 1933 Securities Act, the seller of any "investment contract" or security must file a registration statement with the SEC. A real estate sales contract can qualify as an "investment contract" or a "security" when the buyer "participate[s] in a profit-sharing or rental pooling arrangement upon completing the transaction, or when the transaction includes restrictions limiting the owner's control over the property."[127] Plaintiffs here contend the purchase agreements are securities and that Mona Lisa was required to file a registration statement pursuant to § 77e. Defendants argue the contracts are not securities. The Court agrees.

The *Howey* test governs whether a real estate sales contract is a "security" under the 1933 Securities Act.[128] Sales contracts are securities when: (1) individuals make an investment of money in (2) a common enterprise and (3) when the expectation of profits is to be derived solely from the efforts of others.[129] A party must prove all three prongs of the *Howey* test to establish that a real estate sales contract is a "security" under the Act. Given that each of the plaintiffs made an investment of monies by placing a deposit to purchase a hotel-condominium unit, the parties agree the first prong is met. The parties, however, dispute whether plaintiffs have established the second and third prongs.

As to the second *Howey* factor, in the Eleventh Circuit, a "common enterprise" exists when there is vertical commonality.[130] The Eleventh Circuit's "broad vertical commonality" test requires plaintiff to show that the likelihood of the investment's financial success depends on the efforts of a third-party manager.[131] That is, the buyers are dependent upon a third party who

---

[127] *SEC v. Kirkland*, 521 F. Supp.2d 1281, 1289 (M.D. Florida 2007)*; Alunni v. Development Resources Group, LLC,* 2009 WL 2579319 (M.D. Fla. Aug. 18, 2009) (citing *United Housing Foundation Inc. v. Forman,* 421 U.S. 837, 95 S. Ct. 2051, 44 L.Ed.2d 621 (1975)).

[128] *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

[129] *SEC v. Unique Fin. Concepts, Inc.,* 196 F.3d 1195, 1199 (11th Cir.1999).

[130] *Id.* at 1199 (11th Cir.1999). A common enterprise also is possible when there is horizontal commonality involving a pooling of interests or profits in the transaction. *SEC v. Kirkland,* 521 F.Supp.2d 1281, 1292 (M.D. Fla. 2007). No horizontal commonality exists in this case because it is undisputed that there was no pooling arrangement involved with this project.

[131] *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 732 (11th Cir. 2005).

manages and controls their investments and is solely responsible for the future financial success of the investment. For example, the shareholder of a publicly-traded company does not have direct control over the future value of a company's shares because the shareholder does not have direct control over the company's day-to-day operations and thereby its ultimate financial success. The likelihood that the company's stock value will increase instead depends on how well the company's managers operate the company.

The critical factor in determining vertical commonality then is "the amount of control that the investors retain under their ... agreements."[132] The United States District Court for the Middle District of Florida has held that when condominium buyers gave up a significant amount of control to the condominium developer and were dependant on the developer to realize a return on their investment, the sales contracts were a "security."[133] Some factors that led to the court's decision in *Morris* include that the condominium units were designed to be rented out as hotel rooms, that all revenue was to be shared between the buyers and the developer, and that the developer managed the rental business.[134] Under those circumstances, vertical commonality existed between the condo-unit buyers and the developer because the likelihood of the investment's success was almost entirely dependent on the developer's performance. The more control a developer retains over a buyer's unit and its profitability, the more likely the vertical commonality prong is met.

In this case, no vertical commonality exists. Unlike *Morris,* plaintiffs here retained a significant amount of control over their individually-owned units under the purchase agreements and were not necessarily dependent on Mona Lisa or any other third party to manage their investment. Certainly, each unit came with restrictions that limited plaintiffs' control. For

---

[132] *Albanese v. Fla. Nat'l Bank,* 823 F.2d 408, 410 (11th Cir. 1987).
[133] *Morris v. Bischoff,* 1997 WL 128114, at *5 (M.D. Fla. March 4, 1997).
[134] *Id.*

example, each buyer could occupy the hotel-condominium unit for only 179 days per year. But, on the other hand, the buyer could unilaterally decide how to use the unit during the remaining 181 days of the year. Moreover, when it comes to deciding with whom and whether to sign a rental agreement—arguably the most important decisions concerning the ability to make money from the unit—each owner individually retained near total control over the unit. A buyer *could* use the service offered by Mona Lisa's affiliate to rent a unit, but renting the unit was neither required nor necessarily an integral part of unit ownership. A buyer also *could* have used another rental company totally unrelated to the debtor. A buyer lastly *could* leave the unit vacant for the entire 181 days the buyer could not personally occupy the unit. The choice and the control are left solely to the buyer, not the developer.

The amount of control retained by plaintiffs demonstrates how little dependence they have on Mona Lisa to realize any return on their "investments." Whether a particular buyer treats his hotel-condominium unit as an investment is up to each buyer. Some buyers may rent out their unit for 181 days per year using the debtor's rental management company; other buyers may not rent their unit for even one day. Profitability is not left in the hands of Mona Lisa or its management company. As such, no common enterprise exists.

As to the third prong of the *Howey* test, plaintiffs could not have reasonably expected to profit from Mona Lisa's efforts because Mona Lisa's promotional materials[135] did not highlight the investment aspect of hotel-condominium ownership. The 1933 Securities Act defines the purchase of a security as when an individual "parts with his money in the hope of receiving profits from the efforts of others."[136] The Act thus distinguishes securities transactions from

---

[135] The debtor distributed various brochures and materials on a website to interested purchasers. The materials are attached as exhibits to plaintiffs' affidavits in the Bruno Adversary as Doc. No. 49, Exhibit 2 (the "Small Brochure"); Doc. No. 50, Exhibit No. 3 (the "Large Brochure"); and Doc. No. 51, Exhibit 3 (the "Website Materials").

[136] *United Housing Foundation Inc. v. Forman,* 421 U.S. 837, 858, 95 S. Ct. 2051, 44 L.Ed.2d 621 (1975).

those in which the buyer's purpose is "to use or consume the item purchased."[137] For this reason, courts focus on how the developer markets the properties in its promotional materials. When the developer highlights the investment aspects of a development, as opposed to the amenities and unit features, this is a strong indication the condominiums are securities.[138]

Here, Mona Lisa did not emphasize the investment aspect of hotel-condominium ownership. The promotional materials instead emphasized using the units for vacation and recreational purposes and highlighted the many amenities of the development. Although there were statements in the materials suggesting that the buyers *could* rent their units as hotel rooms, these statements were not the focus of the materials. Furthermore, the purchase agreements include provisions stating that the buyers acknowledge that the seller did not make representations about economic benefits or any tax benefits to be derived from owning a unit.[139]

Mona Lisa's promotional efforts are thus distinct from those of a developer who markets the development as a passive investment opportunity.[140] In *Kirkland,* partly because the developer highlighted the investment opportunities of condo ownership, the District Court for the Middle District of Florida held that the 1933 Securities Act applied to condominium sales contracts because the buyers expected to profit from the developer's efforts to rent their units. By contrast, Mona Lisa's advertising materials focused almost entirely on the amenities available to buyers when they vacationed in their units. Plaintiffs did not sign their sales contract expecting to gain a profit from the efforts of others.

---

[137] *Id.*
[138] *Garcia v. Santa Maria Resort, Inc.,* 528 F. Supp.2d 1283, 1292 (M.D. Fla.2007).
[139] *See, e.g.,* Doc. No. 10–1, p. 9, ¶ 27(a).
[140] *E.g., SEC v. Kirkland,* 521 F.Supp.2d 1281 (M.D. Fla. 2007).

Recent SEC no-action letters[141] and the SEC's 1973 guidelines[142] bolster the Court's finding that the third *Howey* prong is not met here. Each of the four no-action letters advised respective condominium developers that the 1933 Securities Act likely did not apply to the sale of their condo units in part because the developers did not focus their promotional efforts on the development's potential investment value.[143] In each case, the developers did not emphasize the potential economic benefits of purchasing a unit, did not make cash flow estimates or representations of tax advantages, did not have rent pooling agreements, and did not mandate a rental program. The only significant distinction between the developments described in these letters and Mona Lisa's is that the Mona Lisa buyers could occupy their units for 179 days, whereas some of the sales contracts in the SEC no-action letters appear to have imposed even more stringent limitations on buyers, sometimes limiting the buyer's use to two weeks per year.[144] The SEC's guidelines are in accordance with these no-action letters. They state that a real estate transaction is not subject to the 1933 Securities Act when the real estate units "are not offered and sold with emphasis on the economic benefits to the purchaser to be derived from the

---

[141] SEC no-action letters are not binding precedent, but courts can rely on them for their persuasiveness. *Allaire Corp. v. Okumus,* 433 F.3d 248, 254 (2d Cir. 2006).

[142] *Guidelines As to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act,* 1973 WL 158443, Release No. 33–5347, 1 Fed. Sec. L. Rep. (CCH) ¶ 1049 (Jan. 4, 1973).

[143] *Diamond Cove Associates,* 1990 WL 287055 (Sept. 27, 1990) (This case does not identify the real estate development specifically as a "condo-hotel." Rather, it is a condo development which is heavily oriented towards units being rented out to vacationers. The developer anticipated less than 20 percent of units serving as primary residences.); *FC Beach Joint Venture,* 1998 WL 278529 (May 29, 1998); *Int'l Investment Properties, Inc.,* 1995 WL 451934 (July 28, 1995); *Intrawest Corp.,* 2002 WL 31626919 (Nov. 8, 2002).

[144] The *Intrawest* no-action letter strongly suggests buyers in that development could use their units for only two weeks a year by asking "what does the purchaser do with this resort property with the other 50 weeks of the year?" Section III. B. The SEC staff still recommended no enforcement action.

managerial efforts of others...."[145] Here, the promotional materials did not emphasize the economic benefits of hotel-condominium ownership.

Applying the *Howey* test, the Court finds under the undisputed facts of this case that, although buyers did pay a deposit to purchase a unit, no common enterprise exists, nor did the buyers have a reasonable expectation of profits to be derived solely from the efforts of the debtor or its management company. As such, plaintiffs have failed to establish the second and third prongs of the *Howey* test. The purchase agreements are not securities as defined under the 1933 Securities Act, and, as a result, also are not securities under the FSIPA. Mona Lisa did not violate either act by failing to register the purchase agreements. Defendants are entitled to summary judgment on Counts V and VI.

## Mona Lisa Violated the Florida Condominium Act (Count VII)

In Count VII, plaintiffs allege Mona Lisa violated § 718.202 of the Florida Condominium Act[146] by failing to adhere to the strict regulations imposed upon developers who receive deposits from condominium buyers. The Florida Condominium Act regulates the sale of condominium units—a novel form of property ownership when the statute was first enacted in 1963.[147] The rapid growth in condominium construction and ownership between the mid-1960s and early 1980s, along with the "concomitant 'abuses of unscrupulous developers and brokers'" prompted regular revisions by the Florida legislature as the statute expanded to encompass time shares and cooperatives.[148]

---

[145] *Guidelines,* 1973 WL 158443, at *3. The Court notes that the SEC Guidelines also state that "limitations on the period of time the owner may occupy the unit ... suggests that the purchaser is in fact investing in a business enterprise, the return from which will be substantially dependent on the success of the managerial efforts of other person." However, the more recent SEC no-action letters indicate this is only one factor among many that should be considered, and that how the developer advertised the units is also an important factor.
[146] Fla. Stat. § 718.101 *et seq.*
[147] *Double AA Intern. Inv. Group Inc. v. Swire Pacific Holdings, Inc*., 2010 WL 1258086, *6 (S.D. Fla. March 30, 2010) (*aff'd (in part) Double AA Intern. Inv. Group, Inc. v. Swire Pacific Holdings*, 637 F.3d 1169 (11th Cir. 2011)).
[148] *Id.*

Section 718.202 of the Florida Condominium Act imposes obligations on a developer who uses purchasers' preconstruction deposits "to protect purchasers under preconstruction condominium contracts from loss of their deposits should the developer fail to perform its contractual obligations."[149] Interested buyers often pay a "reservation deposit" to hold a particular unit until a contract is signed. Section 718.202 requires a developer to place these reservation deposits into a separate account holding only reservation deposits. The developer also must keep separate accounting for each prospective purchaser's deposits.[150] A developer can access funds from a reservation account once a purchase contract has been signed, at which time all funds immediately are subject to the provisions of § 718.202(1)–(5).

A developer's responsibilities then vary depending on whether a buyer pays a deposit in excess of 10% of the purchase price of a condominium unit. Subsection (1) of § 718.202 requires a developer to pay into an escrow account all purchaser deposits *up to 10%* of the purchase price of the unit (the "Under 10% Escrow") if construction of the condominium project is not substantially complete at the time the developer contracts to sell the unit. A developer may withdraw and use the funds from the Under 10% Escrow if it provides the purchaser with alternative assurance, such as a surety bond, in an amount equal to the Under 10% Escrow. The Division Director of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation in the State of Florida (the "Director") must approve the alternate assurance prior to use by a developer of any of the funds in the Under 10% Escrow.[151]

Subsection (2) of § 718.202 requires a developer to place all deposits received prior to completion of construction *in excess of 10%* of the purchase price of a unit into a separate

---

[149] *First Sarasota Service Corp. v. Miller*, 450 So.2d 875, 878 (Fla. App. 2 Dist. 1984).
[150] Fla. Stat. 718.202(6).
[151] Florida Administrative Code Rule 61B-17.009(1). In the its first summary judgment opinion, the Court found an issue of fact precluded summary judgment as to whether Mona Lisa had properly obtained this needed approval by the Director before using the Under 10% Escrow deposits. *In re Mona Lisa at Celebration*, 436 B.R. 179, 201–02 (Bankr. M.D. Fla. 2010)

escrow account (the "Over 10% Escrow").  Then, and only if the purchase contract so provides, a

developer may use the Over 10% Escrow for the "actual construction and development of the

condominium property in which the unit to be sold is located."[152] A developer's use of the Over

10% Escrow funds for "salaries, commissions, or expenses of salespersons or for advertising

purposes" is strictly prohibited.[153]

A developer who violates § 718.202 of the Florida Condominium Act is subject to stiff

penalties.  The statute essentially imposes strict liability on a developer who fails to comply with

the requirements of § 718.202—the purchase contracts are voidable and the buyers are entitled to

recovery of their deposits.[154] But, if a developer does comply and buyers later refuse to close as

required by their purchase contract, substantially all of the buyers' deposits are forfeited, and the

developer is entitled to recover reasonable fees and costs.[155]

Plaintiffs here claim they are entitled to their deposits, fees, and costs, in this case in

excess of $3.3 million, because Mona Lisa violated the various protections of § 718.202 and then

failed to return plaintiffs' deposits after plaintiffs attempted to void their contracts. Plaintiffs

make the following claims regarding Mona Lisa's § 718.202 violations: (1) Mona Lisa

improperly withdrew funds from the Under 10% Escrow before the Director approved the surety

bond that Mona Lisa secured as adequate assurance; (2) Mona Lisa received deposits from most

purchasers in excess of 10% of the purchase prices of their units, but Mona Lisa failed to

segregate or account for the deposits; (3) Mona Lisa improperly used funds from the Over 10%

Escrow for sales and advertising purposes;[156] (4) Mona Lisa failed to include the required legend

---

[152] Fla. Stat. § 718.202(3).
[153] Fla. Stat. § 718.202(3).
[154] *CRC 603, LLC v. North Carillon*, LLC, 77 So.3d 655, 657 (Fla. App. Dist. 3d  2011).
[155] *Id.*
[156] Doc. No. 177.

on some of the plaintiffs' contracts;[157] and (5) Mona Lisa impermissibly used interest earned on the deposits before the construction was complete.[158] The Court will address these arguments seriatim.

**Mona Lisa Obtained a Proper Surety Bond**
**Before Using Funds From the Under 10% Escrow**

Plaintiffs first allege Mona Lisa violated Fla. Stat. § 718.202 by withdrawing funds from the Under 10% escrow before the Director approved Mona Lisa's surety bond as alternate assurance. Because construction of the units was not completed when plaintiffs signed the purchase agreements, Mona Lisa was required to establish an escrow account for plaintiffs' deposits up to 10% of the purchase price. Mona Lisa did this, as evidenced by the Escrow Agreement.[159] But Mona Lisa also purchased a surety bond as alternative assurance to allow it to withdraw 100% of the Under 10% Escrow deposits.[160] Plaintiffs contend that funds from this escrow were withdrawn as of December 1, 2006, *before* Mona Lisa received the Director's approval, but they have not provided any factual basis for their assertion. As this Court previously noted, if "Mona Lisa can establish that it did in fact obtain the [Director's] approval of the Surety Bond as an alternative assurance *prior to* withdrawing plaintiffs' escrow funds, Count IV [now Count VII] surely must fail."[161]

Defendants now have provided sufficient evidence to establish that Mona Lisa obtained the Director's approval before it withdrew the deposits from the Under 10% Escrow. According to a letter from the Department of Business and Professional Regulations, on Nov. 22, 2006, the Director approved the surety bond as adequate assurance, which allowed Mona Lisa to withdraw

---

[157] § 718.202(3).
[158] § 718.202(1).
[159] Prospectus, Ex. 4, Doc. No. 48; Doc. No. 125, Ex. 1.
[160] Doc. No. 125, Exhibit 3.
[161] Memorandum Opinion Denying Defendant's Motion to Dismiss at 12 (Doc. No. 92 in Case No 9-ap-49; Doc. No. 40 in Case No. 9-ap-769).

the Under 10% Escrow deposits.[162] Mona Lisa has provided numerous bank records of the escrow agent, SunTrust Bank, that prove no funds were withdrawn from the Under 10% Escrow during 2006.[163]  As such, before Mona Lisa used any of the funds, Mona Lisa secured an approved surety bond from Westchester Fire Insurance Company in the amount of $6,575,000 to insure against any kind of loss.

### Mona Lisa Did Not Properly Segregate Plaintiffs' Deposits

Plaintiffs next claim Mona Lisa failed to adequately segregate or classify deposits into escrow accounts as required by § 718.202(1)-(6). The Florida Condominium Act originally required a developer to physically segregate deposits into separate escrow accounts.  A developer could not simply keep separate accountings for over 10% deposits.  Although § 718.202 was amended in 2010, allowing a developer to *either* create separate escrow accounts for the over- and under-10% deposits, or, instead, hold all deposits in one account but maintain separate accounting for each buyer's deposits, Mona Lisa is bound by the original requirements.  Mona Lisa was required to keep the Under 10% Escrow amounts in a separate account from the Over 10% Escrow.[164]

Mona Lisa has proven it created *three* escrow accounts to hold plaintiffs' deposits. Prior to February 2006, Mona Lisa placed all deposits it received into Account #7900086 (the "Reservation Account").[165] (In some cases, Mona Lisa improperly used the Reservation Account to hold a purchaser's down payment *after* he signed a purchase contract.) In February 2006, prior to breaking ground on the development or disbursing any funds from any of the escrows, Mona Lisa directed SunTrust to divide buyers' deposits into two separate accounts—Account #7908776 (for the Under 10% Escrow) and Account #7911486 (for the Over 10% Escrow). After

---

[162] Doc. 65 Exhibit 4 in 9-ap-770.
[163] Doc. No. 125 Exhibit 1.
[164] Fla. Stat. 718.202(11). *See CRC 603, LLC,* 77 So.3d 655.
[165] Doc. No. 224 at 3.

February 2006, Mona Lisa claims it deposited 100% of the preconstruction deposits directly into the Under 10% Escrow, then expeditiously transferred funds into the Over 10% Escrow as appropriate. This two-step process was necessary because not all buyers issued a separate check for deposits under and over 10% of their purchase prices.

Mona Lisa claims all transfers from the Under 10% Escrow to the Over 10% Escrow occurred promptly, within fifteen days after receipt of the deposits.[166] Plaintiffs' argument that Mona Lisa violated § 718.202 rests on the fact that buyers' deposits were not segregated *immediately*, but comingled in either the Reservation Account or Under 10% Escrow for a period of time *after* the purchase contracts were signed.[167] Plaintiffs list 29 alleged violations of § 718.202(2)'s segregation requirement.[168]

The record shows that in the heat of the real estate boom, some plaintiffs indeed made reservation deposits to reserve the right to purchase a particular unit before they signed a purchase contract.[169] Mona Lisa generally placed these monies into the Reservation Account. Any kind of segregation, physical or otherwise, of these deposits was impossible *prior* to signing a contract because the 10% calculation was indeterminable without a purchase price.[170]

Upon signing a contract, however, the statute requires prompt segregation of the deposits into separate escrows to protect a buyer's deposits from misuse. Section 718.202(6) reads, "upon the execution of a purchase agreement for a unit, any funds paid by the purchaser as a deposit to reserve the unit pursuant to a reservation agreement, and any interest thereon, shall cease to be subject to the provisions of this subsection and shall instead be subject to the provisions of

---

[166] *Id*. at 5 (except for a single plaintiff whose deposits were segregated 16 months after the funds were established). The Court need not address this singular issue because all plaintiffs are entitled to recovery based on Mona Lisa's violation of the escrow agreement in § 718.202(3).
[167] Doc. No. 205 at 17.
[168] *Id*. at 17–19. See also Doc. No 205, Exhibit 2.
[169] Doc. No. 205, Exhibit 2. This summary is consistent with the SunTrust records submitted by Mona Lisa.
[170] Doc. No. 223 at 3.

subsections (1)-(5)." Sections (1) and (3) require the classification into the over- and under-10% amounts.

Mona Lisa often failed to either classify or physically segregate some purchasers' deposits promptly after they executed their purchase contracts. Plaintiffs Ajogbasile and Hill, purchasers of Unit 124, provide an example. Together these two plaintiffs contracted to purchase a unit, and, on April 28, 2005, they made their first reservation deposit with Mona Lisa for $12,500, which was placed in the Reservation Account. On June 21, 2005, they made another $24,900 payment. On September 25, 2005, they signed a contract to purchase Unit 124 for $349,000. With the execution of the contract and the determination of the purchase price, Mona Lisa and SunTrust were required by § 718.202 to transfer $34,900 of the total deposits from the Reservation Account to the Under 10% Escrow and $2,500 to the Over 10% Escrow. (Of course, these accounts were not even opened until February 2006.) Mona Lisa simply left these deposits in the Reservation Account for several months.  In addition, even after signing the contract, on October 4, 2005, Mona Lisa took another deposit from Ajogbasile and Hill in the amount of $14,950 and comingled it in the Reservation Account.

Mona Lisa did not open the required escrow accounts until February 2006, over four months after Mr. Ajogbasile and Ms. Hill signed their purchase contract.  Even though Mona Lisa never *used* any of the funds from the Reservation Account before it transferred them, it impermissibly comingled at least some of the deposits in violation of § 718.202(1)-(6).[171] "[F]ailure to comply with the provision of this section renders the contract voidable by the buyer, and if voided, *all* sums deposited or advanced under the contract shall be refunded with interest." At least some of the plaintiffs are entitled to void their contracts and receive the return of their

---

[171] An argument of "no harm, no foul" is circular reasoning because plaintiffs would have to wait until their assets are lost before they can act under § 718.202. *Double AA Intern. Inv. Group, Inc. v. Swire Pacific Holdings, Inc.* 2010 WL 1258086, *21 (S.D. Fla. 2010).

deposits with interest because of Mona Lisa's failure to segregate or account for their deposits after they signed purchase contracts as required by § 718.202 of the Florida Statutes.[172] The Court need not determine, however, exactly which plaintiffs' deposits were wrongly held because under § 718.202(3) or § 718.502, discussed next, *all* plaintiffs are entitled to return of their deposits.

### Mona Lisa Improperly Used the Escrow Funds for Advertising Purposes

Plaintiffs next claim Mona Lisa violated § 718.202(3) by withdrawing funds from the Over 10% Escrow and improperly using them for expenses unrelated to construction and development. As already noted, the first subsection of § 718.202 protects the first 10% of a buyer's deposit from loss by requiring a developer to hold it in escrow or obtain another form of assurance before those funds are to be released to the developer. Section 718.202(3) allows a developer to use the portion of buyers' deposits *over* 10% of the purchase price[173] for the "actual construction and development of the condominium property"[174] without first obtaining alternative assurances, *as long as these funds are not used for salaries, commissions, or expenses of salespersons or for advertising purposes.*[175]

Plaintiffs claim "from July 6, 2007 through August 8, 2008, over $2,000,000 was transferred from the Over 10% Escrow to the Mona Lisa Project Account and used for improper purposes unrelated to construction of the project."[176] Plaintiffs point to expenses such as payroll expenses, property taxes, surety bond payments, legal fees, loan extension fees, loan costs, and

---

[172] No private cause of action exists under § 718.202 against SunTrust, as escrow agent, for these failures. *Double AA Intern. Inv. Group, Inc. v. Swire Pacific Holdings, Inc.*, 637 F.3d 1169, 1171 (11th Cir. 2011). *See infra,* Count XVI.
[173] Interestingly, § 718.202 places no similar restrictions on the use of the Under 10% Escrow, presumably because buyers are protected by the equivalent surety bond.
[174] Fla. Stat. § 718.202(3).
[175] Fla. Stat. § 718.202(3) (emphasis added).
[176] Doc. No. 205 at 11.

payment for sales center rent as those expenses not related to construction and development of the project.[177]

Mona Lisa insists it used the Over 10% Escrow funds only for construction and development related expenses, and "only as permitted by Florida law."[178] Mona Lisa claims it transferred deposits from the Over 10% Escrow to either the Mona Lisa Project Account or the Mona Lisa Operating Account to pay construction and development-related expenses. William Haberman, managing member of Mona Lisa Development, LLC, swore in his affidavit that each and every disbursement of over 10% funds was for a specific purpose relating to the construction or development of the project, and each and every transfer of funds represented a reimbursement to the operating account for proper expenditures.[179]

No court has decided under § 718.202 what expenses are properly associated with "actual construction and development." Plaintiffs advocate for a narrow interpretation of the terms "construction and development" based on a dictionary definition that suggests "development" is "building or constructing on land."[180] They argue this is warranted because the statute is intended to protect the purchasers of pre-construction condominiums, and the legend in their contracts only informs buyers that their deposits over 10% may be used "FOR *CONSTRUCTION PURPOSES* BY THE DEVELOPER."[181] Mona Lisa objects to this definition because it excludes development-related expenses like taxes, professional fees, insurance, and salaries because,

---

[177] Doc. No. 205 at 10-15.
[178] Doc. No. 208 at 51.
[179] He claims this transfer process was necessary because when expenses became payable, the Over 10% Escrow lacked sufficient funds to pay them. In other words, Mona Lisa argues these payments were *reimbursements* for proper expenses already paid from another account.
[180] Doc. No. 230 at 13 (citing Merriam-Webster's Dictionary).
[181] Doc. No. 230 at 13 (citing Florida Statute § 718.2.2(3))(emphasis added).

although they do not relate to the physical construction of a building, the costs are critical and necessary to complete construction.[182]

"Apply[ing] the statute in a realistic, common sense manner that will preserve the basic contract rights of the parties while affording the purchaser the protection the legislature intended"[183] requires this Court to look beyond dictionary definitions, and instead consider common industry practices for what "construction and development expenses" really means. The Court first notes that the unambiguous language of § 718.202 allows a developer to use the Over 10% Escrow for construction *and* development, regardless of what the legend tells purchasers.[184]

Second, professional fees and expenses are essential to the overall development of a real estate project. When a developer obtains a construction loan to develop a project, it commonly receives funding for development expenses because they are integral to the completion of a real estate project. Construction lenders anticipate these kinds of costs, and disburse funds to developers for all expenses related to the physical and non-physical aspects of developing a property.[185] Therefore, the costs plaintiffs complain of, including bank extension fees, loan costs, engineering expenses, design expenses, and construction management fees can reasonably be characterized as costs related to the overall construction and development of the Mona Lisa project. Courts should interpret the term "construction and development expenses" broadly, recognizing that some costs are visible, hard-costs, and some expenses are just as critical to the project, but perhaps not as visible.

---

[182] Doc. No. 230 at 13.
[183] Doc. No. 230 at 14.
[184] *Rollins v. Pizzarelli*, 761 So.2d 294, 297 (Fla. 2000) (noting "when the language of the statute is clear and unambiguous and conveys a clear and definite meaning . . . the statute must be given its plain and obvious meaning.").
[185] *Douglas County Bd. Of Equalization v. Fidelity Castle Pines*, 890 P.2d 119 (Colo. 1995). Construction and Development Financing § 3:141(3d Ed). *See also In re GIC Government Securities, Inc.*, 98 B.R. 71, 72 (Bankr. M.D. Fla. 1989) (recognizing certain soft costs relating to the development, such as appraisal fees, engineering costs, and the franchise application fee).

The statute however contains a specific limitation—a developer cannot use the Over 10% Escrow monies for "salaries, commission, or expenses of salesperson or for advertising purposes." On this point, the Court finds that, even broadly defining "construction and development costs," Mona Lisa impermissibly used a portion of the plaintiffs' deposits for advertising and sales related purposes. It paid rent on the Mona Lisa at Celebration Sales Center.

Advertising can take many forms, and the term should be construed within the meaning of the statute.[186] In this case, § 718.202 strictly prohibits the developer's use of over-10% deposits for advertising and sales expenses, i.e., any expense used to attract or entice buyers to enter into pre-construction contracts. The Mona Lisa sales center does just this. The undeniable function of a sales center is to secure and process purchase contracts for units in a condominium development. Sales centers display model units, finishes, drawings and renditions of the units, and are staffed by experienced and suggestive salespersons whose job it is to sell those units and execute purchase contracts. All of these activities constitute on-premise advertising, which is an impermissible use of plaintiffs' deposits.[187]

Mr. Haberman acknowledges in his affidavit that Mona Lisa simply deposited the Over 10% Escrow monies into Mona Lisa's Operating or Project Account. Once deposited, the monies were irretrievably commingled so that it is impossible to determine if the rental center costs were borne by the plaintiffs or, as Mr. Haberman argues, paid from other sources. This is similar to a husband and wife with separate bank accounts who also share a joint account. Once the monies are placed in the joint account, you cannot say one spouse versus the other paid the electric bill or bought the groceries.

---

[186] *People v. Montague*, 274 N.W. 347 (Mich. 1937); *Home-Owners Ins., Co. v. Thomas Lowe Ventures, Inc.*, 1998 WL 1856221 at *4-6 (Mich. Cir. Ct. August 27, 1998). *See also Amsel v. Brooks*, 106 A.2d 152, 158 (Conn. 1954) (Advertising means the act or practice of attracting public attention to a product, service, or business, directly or indirectly, for the purpose of inducing a sale by emphasizing desirable qualities.
[187] *See Metromedia, Inc., v. City of San Diego*, 453 U.S. 490, 526 (1981) (discussing advertising display signs in an opinion regarding First Amendment rights).

The undisputed facts are that Mona Lisa placed all of the funds in the Over 10% Escrow account into its general operating account and that Mona Lisa paid the rental center costs from that account, which is an expense prohibited by § 718.202. Because monies, once commingled, are fungible, Mona Lisa cannot after the fact "reimburse" the expenses.[188] The bell once rung cannot now be un-rung.

Mona Lisa's use of plaintiffs' deposits for sales center rent violates § 718.202(3). Because § 718.202 is a strict liability statute, Mona Lisa's good faith efforts to comply with the statute do not negate its liability.[189] Failure to comply with this section renders the contract voidable by the buyer, and plaintiffs who paid more than a 10% deposit are entitled to a refund of their full deposits, not just the over 10% portion, with interest.[190] This result is required because, according to § 718.202(5) "failure to comply with the provision of this section renders the contract voidable by the buyer, and if voided, *all* sums deposited or advanced under the contract shall be refunded with interest."[191] Plaintiffs who paid more than a 10% deposit also are entitled to full payment of their reasonable attorney fees and costs. [192]

The Court acknowledges that the sanction to Mona Lisa in this case is a significant penalty for a relatively small infraction of the statute. Plaintiffs paying more than a 10% deposit can void their contracts and will receive their down payment (in full) with interest and attorney fees. The strict liability is appropriate because otherwise developers would have no incentive to meticulously comply with the laudatory purposes underlying the Florida Condominium Act—to insure that the purchasers' deposits are used for the intended purpose of building a condominium

---

[188] *See Abdnour v. Abdnour*, 19 So.3d 357, 364 (Fla. App. 2d Dist. 2009) (Money is fungible and once it is comingled it loses it separate character).

[189] Other sections of the Florida Condominium Act, such as Fla. Stat. § 718.505, allows for good faith noncompliance with *disclosure* requirements. Section 718.202, however, contains no good faith exception.

[190] Fla. Stat. § 718.202(5).

[191] § 718.202(5) (emphasis added).

[192] Fla. Stat. § 718.125 allows the prevailing party to recover attorneys' fees. Paragraph 25 of the purchase contracts provides the prevailing party is entitled to attorney fees and costs for breach of contract. Doc. No. 125 Exhibit 7.

they can occupy.  In this case, although Mona Lisa did complete construction, it did not comply with the use limitations imposed by § 718.202. All plaintiffs except one party paid deposits of over 10% of their purchase prices; all these plaintiffs are entitled to summary judgment on Count VII.[193]

### Factual Issues of Mona Lisa's Good Faith
### Preclude Summary Judgment on Disclosure Breaches

Plaintiffs allege Mona Lisa violated § 718.202(3) because 11 of the purchase contracts failed to comply with its disclosure provisions.[194] Specifically, a contract permitting the use of escrowed funds for proper purposes must include the following legend "conspicuously printed or stamped in boldfaced type on the first page of the contract and immediately above the place for the signature of the buyer:"[195]

> ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.[196]

Mona Lisa concedes that 11 of the purchasers' contracts do not contain the required disclosure on the first page, but offers no explanation for this failure. Instead, Mona Lisa argues the omission was unintentional and seeks the protection under the good faith exception in § 718.505.[197] Mona Lisa also suggests plaintiffs were not harmed because the form purchase contract that was provided in the prospectus contained the required legends that sufficiently placed plaintiffs on notice.

---

[193] All plaintiffs paid deposits in amounts over 10% of their purchase prices *except* the Byrnes, who paid deposits totaling exactly 10% of the purchase price for their two units, 303 and 319. The Byrnes are not entitled to recovery under Fla. Stat. § 718.202. But, the Byrnes signed Updated Purchase Agreements and are entitled to recover their deposits, with interest, costs, and fees, under Count VIII.
[194] Contracts for Unit Nos. 136, 218, 219, 221, 237, 511, 523, 536, 538, 545, and 547.
[195] *Id.*
[196] *Id.*
[197] Doc. No. 228 at 23; Doc. No. 125.

Understandably, the disclosure requirements of the Act may cause some confusion. At first blush, § 718.202(3) appears to demand strict compliance because the intent of a disclosure is to make purchasers aware of a risk, for example, a risk that their deposits could be spent by a developer for construction purposes. Without this disclosure, purchasers would be unaware of the risk that their funds could be depleted by the developer, and once depleted, purchasers would have greater difficulty in recovering them upon a developer's breach of contract.[198] Plaintiffs ask the Court to follow *Cueller v. In re Harbor East Development, Ltd.,* which awarded rescission of the plaintiffs' condominium contracts because the developer did not strictly comply with the legend requirement in § 718.202(3).[199]  In that case, the legend on the first page of a purchase contract inadvertently was pushed to the second page because of an amendment to the contract.[200]

A closer read of the entire Florida Condominium Act as a whole indicates certain errors or omissions, like the one in *Cueller*, are excusable upon a showing of good faith. Section 718.505, "Good Faith Effort to Comply," states that nonmaterial errors or omissions in the *disclosure materials* are not actionable "[i]f a developer, in good faith, has attempted to comply with the requirements of this part (Part V of the Condominium Act),[201] and if, in fact, he or she has substantially complied with the disclosure requirements of this chapter (Chapter 718 – the Condominium Act)."[202]

Read together, § 718.202 and § 718.505 require a developer to make a *good faith effort* to *substantially comply* with the disclosure requirements of the Act, which Mona Lisa claims it has

---

[198] *Pretka,* 2011 WL 841513 at *4.

[199] Doc. No. 205 at 19 (citing *Cueller v. In re Harbor East Development, Ltd.* 2011 WL 2550461 at * (Bankr. S. D. Fla. June 20, 2011)).

[200] *Id.*

[201] Part V of the Condominium Act "Regulation and Disclosure Prior to Sale of Residential Condominiums" largely governs to enforcement and oversight of the Act.

[202] *Bruce v. O'Neill,* 445 So.2d 379 (Fla. App. 4th Dist. 1984); *Pretka,* 2011 WL 841513.

done. Summary judgment on whether Mona Lisa acted in good faith or substantially complied with the disclosure provisions of the Florida Condominium Act is improper because "[a] trier of fact may need to weigh each of these factors separately or in relationship to each other in determining whether a developer *substantially complied* with section 718.202(3)."[203]

Lack of prejudice alone is not sufficient justification to find summary judgment for defendants on this issue.[204] In Florida, the developer must show a *good faith effort* to comply with the disclosure provisions of the Act as a prerequisite to proving the purchasers were not harmed.[205]

### Mona Lisa Was Entitled to Earn Interest on the Escrow Accounts.

Plaintiffs next argue Mona Lisa impermissibly took interest earned on the escrow accounts prior to closing in violation of § 718.202(1).[206] Section 718.202(1) requires a developer to wait until closing to receive interest on buyers' deposits "*if* the contract does not provide for the payment of any interest earned on the escrowed funds."[207] Mona Lisa was permitted to earn interest on the deposits because the escrow agreements, incorporated into the contracts by reference, provided that Mona Lisa "was entitled to receive all of the interest earned on deposits unless provided otherwise in the applicable Contracts or in the Condominium Act."[208] In Florida, a "document may be incorporated by reference in a contract if the contract specifically describes

---

[203] *Pretka,* 2011 WL 841513 at *5 (emphasis added) (rejecting defendant's motion to dismiss and holding "[a] trier of fact may need to weigh each of [the § 718.505] factors separately or in relationship to each other in determining whether a developer substantially complied with section 718.202(3).").

[204] The Court disagrees with *Pretka v. Kolter City Plaza II Inc.,* 2011 WL 3204256 to the extent it required the plaintiffs to allege prejudice.

[205] *Bruce,* 445 So.2d at 380 ("We are doubtful as to the cause of action for statutory rescission [under section 718.506] where there is absolutely no demonstration that the plaintiff/purchaser was even slightly prejudiced by the technical statutory noncompliance of the seller."); *Beach Place Joint Venture v. Beach Place Condo. Assoc.,* 458 So. 2d 439, 441 (Fla. App. 2d Dist. 1984) ("Appellant urges that a good faith attempt was made to comply with the Condominium Act, Chapter 718, Florida Statutes, and that the recording error should not be used to provide a windfall to the condominium owners. We agree.").

[206] Doc. No. 177 at ¶ 222.

[207] Fla. Stat. § 718.202(1) (emphasis added).

[208] Doc. No. 125 Exhibit 1 at 4.

the document and expresses the parties' intent to be bound by its terms."[209] The purchase agreements and escrow agreements specifically allowed Mona Lisa to receive interest on plaintiffs' deposits.

### Summary of Ruling on Florida Condominium Claims (Count VII)

In summary, although defendants are entitled to a summary finding that Mona Lisa *did* obtain the necessary surety bond and the Director's approval before using the escrowed funds, and that Mona Lisa was entitled to use interest accruing on the escrowed funds, factual disputes preclude any summary finding as to whether Mona Lisa substantially complied with the disclosure requirements in the Florida Condominium Act. In the end, the Court will award summary judgment in favor of the plaintiffs on Count VII. Mona Lisa did not properly segregate the funds into the necessary accounts on a timely basis. More significantly, Mona Lisa used the plaintiff's deposits for improper advertising purposes. Therefore, pursuant to § 718.202(1)(a), buyers properly terminated their contracts, and Mona Lisa should have refunded plaintiffs' deposits with interest.[210] Plaintiffs are entitled to a full refund of their deposits with interest, the payment of their reasonable attorney fees and costs, and the revocation of their purchase agreements.

### Mona Lisa Failed to Submit the
### Updated Purchase Contracts for Division Approval (Count VIII)

Part V of the Florida Condominium Act titled "Regulation and Disclosure Prior to Sale of Residential Condominiums" governs a developer's obligations prior to selling *residential*

---

[209] *Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So.2d 627, 631 (Fla. App. 1stDist. 1999); *see also OBS Co. v. Pace Constr. Corp.*, 558 So.2d 404, 406 (Fla. 1990) ("It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing."). The ability to incorporate by reference applies equally to statutes. *See Century Vill., Inc. v. Wellington E, F, K, L, H, J, M, & G, Condo. Ass'n.*, 361 So.2d 128, 133 (Fla. 1978); *Geico Indem. Co. v. Virtual Imaging Services, Inc.*, 2011 WL 5964369, 5 *(*Fla. App. 3d Dist. 2011*)*.

[210] Fla. Stat. § 718.202(1)(a) reads "If a buyer properly terminates the contract pursuant to its terms or pursuant to this chapter, the funds shall be paid to the buyer together with any interest earned."

condominiums. Section 718.502(1)(a) of the Act requires a developer of a residential condominium to file with the Division one copy of each document required by §§ 718.503 and 718.504, including the purchase and sale agreement, and, until a developer has filed the agreement, a sale contract remains voidable by the purchaser prior to closing.[211] Plaintiffs who executed the Updated Purchase Agreements seek summary judgment under Count VIII alleging Mona Lisa failed to submit the Updated Purchase Agreement to the Division for approval after Mona Lisa amended it to include the two-year obligation to complete construction so it would qualify for the ILSFDA exemption.[212]

Mona Lisa concedes "it did not file a copy of the post-March 2006 form Purchase Agreement with the Division,"[213] but disputes that it was required to comply with this provision because the units in the project were not "residential condominiums" governed by § 718.103(23) but instead, the project was a "commercial hotel" with a primarily commercial use.[214] Alternatively, Mona Lisa argues that even if § 718.502 applies, Mona Lisa complied because it obtained Division approval of the original form contract and the revision of the contract actually increased plaintiffs' rights by including a firm 2-year completion deadline and was not otherwise inconsistent with Chapter 718.[215]

The Act defines "Residential condominium" as:

> "a condominium consisting of two or more units, any of which are intended for use as a private temporary or permanent residence, *except that* a condominium is not a residential condominium if the use for which the units are intended is primarily commercial or industrial and not more than three units are intended to be used for private residence, and are intended to be used as housing for maintenance, managerial, janitorial, or other operational staff of the condominium. With respect to a condominium that is not a timeshare

---

[211] Fla. Stat. § 718.502(1)(a). *See also Clone, Inc., v. Orr*, 476 So.2d 1300, 1302 (Fla. App. 5th Dist. 1985).

[212] Doc. No. 57 at 19-20 in Case No. 9-ap-770. See infra Counts I – IV.

[213] Defendant's Responses and Objections to Plaintiffs' Requests for admission. Doc. No. 46 in 9-ap-859 Exhibit 1. In answer no. 6, Mona Lisa admits it did not submit its post-March 2006 agreement to Division.

[214] Doc. No. 76 at 8 in 9-ap-770; Doc. No. 225 at 14.

[215] Doc. No. 225 at 14.

condominium, a residential unit includes a unit intended as a *private temporary* or *permanent residence as well as a unit not intended for commercial or industrial use.*"[216]

Plaintiffs first argue that the units are residential because they could be used for up to 179 days and were intended as a "private temporary residence."[217] Mona Lisa disputes this, emphasizing the fact that the project is zoned commercial and plaintiffs all received marketing materials that consistently referred to the hotel suites as a hotel condominium to be used for "transient hotel room occupancy rentals."[218]

The Court finds the units are residential because they were intended primarily as private temporary residences for plaintiffs' personal use, and not for rental or investment purpose. Mona Lisa cannot argue the units were intended to be commercial rental units without admitting that they also were intended to be purchased as investments. If this were true, Mona Lisa would be required to furnish registration statements under federal and state securities laws.[219] Mona Lisa argues in Counts V and VI that the units are *not* investments subject to securities regulations because plaintiffs retained a significant amount of control over their individually-owned units, plaintiffs were not ever required to rent their units, and plaintiffs could live in their units temporarily for up to 179 days a year and leave them vacant the rest of the year if they so chose. The Court agreed and concluded that plaintiffs could not have reasonably expected to profit because, as Mona Lisa argues, the promotional material did not highlight the investment aspect of hotel-condominium ownership, and Mona Lisa's advertising materials focused predominantly on the amenities of the development.

---

[216] Fla. Stat. § 718.103(23) (emphasis added).

[217] Doc No. 61 in 9-ap-859.

[218] Mona Lisa is mistaken, however, when it suggests "this Court held in its August 2010 Opinion that Mona Lisa is not a residential condominium." What the Court *specifically* held was that Mona Lisa was not selling residential units within a Community Development District based on plaintiffs' allegations under Fla. Stat. § 190.048—it made no determination as to the residential nature of the individual units themselves. *In re Mona Lisa at Celebration,* 436 B.R. 179, 208 (Bankr. M.D. Fla. 2010).

[219] *See infra,* Counts V – VI.

The Court therefore finds that the units are "residential" and not commercial. [220] As such, Mona Lisa was required to comply with the requirements in Part V of the Act and submit the Updated Purchase Agreements to the Division for approval. Mona Lisa admittedly failed to do this. And, even though the inclusion of the two-year obligation to construct may have increased plaintiffs' rights and caused no harm, a developer's obligation to submit purchase contracts to the Division for approval is not a "disclosure requirement" entitled to reprieve under the good faith exception in § 718.505. The disclosure requirements of Chapter 718 are those required to be given to prospective purchasers so that they can make informed decisions about whether to purchase a pre-construction condominium unit from a developer. Conversely, a developer's requirements under §§ 718.502, 718.503 and 718.504 to submit purchase agreements, condominium declarations, bylaws, association agreements, operating statements, and other important condominium documents to the Division for approval provides a different and added protection to buyers because the Division, in its paternal capacity, ensures a purchaser has, at a minimum, all the documents it needs to make an informed purchase. Theses submissions cannot be overlooked or marginalized by the good faith escape hatch in § 718.505.

---

[220] Mona Lisa also argues that even if the Court finds the units to be residential, this section of the Act still does not apply because an administrative rule interpreting § 718.502 provides an exception. Administrative Rule 61B-17.006(2)(b) reads:

> No changes shall be made to the form purchase contract approved by the Division without first filing and obtaining acceptance of such changes from the Division. However, in an *individual unit sale transaction* using the form purchase contract approved by the Division, a change to the purchase contract or a modification made on the purchase contract or the attachment of a rider or addendum to such contract is not required to be filed with the Division *provided that such change, modification, rider or addendum does not contain either a waiver or reduction of purchaser's rights under Chapter 718, F.S., or a reduction of a developer's duties under Chapter 718 F.S., and the rules promulgated there under, and is not otherwise inconsistent with Chapter 718.F.S. (Emphasis Added).*

The first sentence clearly requires all changes to a purchase form to be submitted to the Division. The second sentence refers to modifications of an "individual unit sale," a scenario not applicable to the facts of this case because Mona Lisa was selling numerous units. Therefore, whether or not the change was material is irrelevant. This administrative rule sets forth the procedures a developer must follow if it alters documents required to be filed with the Division. *See Garcia v. Swire,* 2010 WL 1524230 at *4 (S.D. Fla. April 14, 2010).

Summary judgment is granted in favor of the plaintiffs who signed Updated Purchase Agreements, listed in Appendix D, under Count VIII. Their contracts are voidable, and plaintiffs are entitled to the refund of their deposits,[221] interest,[222] and reasonable attorney fees and costs.[223]

### Mona Lisa Made No Adverse Alterations
### That Would Allow Buyers to Rescind Their Contracts (Count IX)

Florida Statute § 718.503(1)(a)(1) allows a condominium unit buyer to rescind a purchase agreement within 15 days "after the date of receipt from the developer of any amendment which materially alters or modifies the offering in a manner that is adverse to the purchaser."[224] Section (b) of this statute also allows a buyer to void a contract if a developer fails to provide a prospectus that includes all required exhibits, including, but not limited to, the declaration of condominium, articles of incorporation, association by-laws, and other documents related to condominium ownership.[225]

In Count IX, plaintiffs first allege Mona Lisa violated § 718.503(a)(1) by making materially adverse changes to the design of the development's common areas.[226] They claim Mona Lisa reduced the size of the pool deck by half. Second, they allege Mona Lisa's decision to eliminate a rooftop deck on top of the hotel amenities building, in favor of adding space to the lower floors of the building, was a material adverse change to the project. Plaintiffs also allege Mona Lisa violated § 718.503(b) by failing to provide them with a prospectus that included all required exhibits.[227] The Court will address each argument in turn.

---

[221] Fla. Stat. § 718.502(1)(a).
[222] Fla. Stat. § 718.202(1)(a).
[223] Fla. Stat. § 718.125. Section 25 of the purchase contracts provides for reasonable attorney fees and costs to the prevailing party of any litigation arising out of the purchase contracts.
[224] Fla. Stat. § 718.503. *See In re Suncoast East Assoc.*, 241 B.R. 476 (Bankr. S.D. Fla. 1999); *Mona Lisa*, 436 B.R. at 202–03; *D & T Properties, Inc. v. Marina Grande Associates, LTD.*, 985 So .2d 43 (Fla. App. 4th Dist. 2008).
[225] Fla. Stat. 718.503(b) (referring to § 718.504)(24).
[226] See Doc. No. 61 at ¶56 in Case No. 9-ap-859, among other places.
[227] Doc. No. 177 at ¶ 255.

As to the pool deck, plaintiffs contend Mona Lisa reduced the size of the deck area surrounding the common area pool to nearly half the size originally represented to them in the Prospectus.[228] The Prospectus states the pool would be "surrounded by approximately twenty-three thousand five hundred (23,500) square feet of decking," and would provide space for about 150 people. Plaintiffs allege that the decking as built provides only 12,096 square feet of actual deck space. Plaintiffs are correct that 12,096 square feet of the pool decking is comprised of hard concrete pavers, but they seem either to ignore or to discount entirely the additional 11,500 square feet of landscaping and walkways interwoven with this concrete. By doing so, plaintiffs have completely misrepresented the as-built pool deck. In fact, the completed project has a usable pool area of nearly 23,500 square feet containing ample sitting areas for 150 people, plus elegant palm trees, planters, walkways, and other landscaping features that break up the deck space. Although plaintiffs are correct that the Prospectus states the pool deck would be 23,500 square feet, it does not state the pool deck would provide 23,500 square feet of open, unlandscaped deck space. Moreover, Mona Lisa's architectural drawings of the pool deck never changed—they always represented that the *total space* available around the pool was approximately 23,500 square feet and, as built, it is as represented.[229]

Plaintiffs are grasping at straws by complaining about a spectacular pool deck that in all material respects was built as originally represented to them. The square footage of the entire area never changed; the capacity is as represented in the Prospectus—150 people. Accordingly, the Court finds there were *no* changes made to the pool deck plans and representations, let alone any material adverse changes.

---

[228] Doc. No. 48 at 5.
[229] See Prospectus, Doc. No. 48, and architectural renderings therein.

As to the elimination of the rooftop deck, plaintiffs argue that Mona Lisa represented to them in its promotional materials that there would be a fourth-floor observation deck on top of the hotel amenities building and that Mona Lisa's decision not to build the roof deck materially and adversely affected the value of the project. Mona Lisa does not dispute that no roof deck was built, but they argue that eliminating the roof deck was not a material adverse change because they substituted other enhancements that *added* overall value to the project. Specifically, Mona Lisa substantially enlarged the restaurant and bar areas of the first floor of the hotel amenities building and built a covered balcony for dining on the second floor of the building.[230]

As an initial matter, whether an amendment to a design plan is "material" and "adverse" under § 718.503 is determined by an objective standard.[231] The question is: "would a reasonable buyer under the purchase agreement find the change to be so significant that it would alter the buyer's decision to enter into the contract?"[232] The actual buyer's own thoughts are irrelevant. The inquiry is completely focused on whether the change significantly decreased the value of the original, proposed development plans from a reasonable buyer's perspective.

Plaintiffs continue to rely on their argument set forth in their first motion for summary judgment, which cited three cases for the proposition that any reduction or elimination of amenities is a material and adverse change.[233] The Court rejected all three. Two of the cases were decided under another statute—Fla. Stat. § 718.506.[234] One of these cases, *Gentry,* at most stands for the proposition that, assuming their falsity, numerous alleged misrepresentations *could* amount to a material misrepresentation under Fla. Stat. § 718.506. In that case, the court merely

---

[230] Specifically, see Small Brochure, pg. 10; Large Brochure, pg 8; Website Material, pg 1.
[231] *See D & T Properties, Inc.,* 985 So.2d at 49.
[232] *Id.*
[233] Doc. No. 45 at 14, *citing Gentry,* 2008 WL 1803637, *2–4 (S.D. Fla. April 21, 2008); *Klinger,* 502 So.2d at 1254; and *Mastaler v. Hollywood Ocean Group, L.L.C.,* 10 So.3d 1114 (Fla. Dist. Ct. App. 4th 2009). Doc No. 61 at ¶ 56-57 in Case No. 9-ap-859.
[234] *Gentry,* 2008 WL 1803637 at *3; *Klinger,* 502 So.2d at 1254.

held that such allegations were enough to survive a motion to dismiss.[235] The second case decided under Fla. Stat. § 718.506, *Klinger*,[236] held that the elimination of an outdoor jogging path and VITA course was "substantial noncompliance" with the planned development scheme. In so holding, the court found the condo unit purchasers had a substantial interest in the development's recreational facilities and amenities.[237] At best, this case may tend to support plaintiffs' position that they had an interest in the common areas of the Mona Lisa development. But the case does not establish a per se rule that altering the location of a common area element automatically establishes a violation of § 718.503, insofar as that statute was not even at issue in the case.

The one case cited by plaintiffs in which § 718.503 *was* at issue also fails to support plaintiffs' argument.[238]  *Mastaler* held that the addition of nine private cabanas around a condominium development's pool was a material adverse change.[239] The court reasoned that "a reasonable buyer would find the change significant to their decision to enter the contract" because the pool's available deck space was substantially reduced by the cabanas and the cost to use a cabana was material, at $225,000.[240]

Unlike the changes made to the pool deck in *Mastaler,* the changes Mona Lisa made to the hotel amenities building are not overtly either material or adverse. In that case, the court found that adding nine private cabanas around the pool deck unquestionably was adverse to plaintiff because the cabanas "hinder[ed] his use of the common area around the pool."[241] Here,

---

[235] *Gentry,* 2008 WL 1803637 at *3.
[236] *Klinger,* 502 So.2d at 1253–54.
[237]  *Id.* at 1254.
[238] *Mastaler* 10 So.3d 1114.
[239]  *Id.* at 1116.
[240] *Id.*
[241] *Id.*

Mona Lisa compensated for eliminating the roof deck by *adding* other significant enhancements to the hotel amenities building, an offset that was not present in *Mastaler*.

Whether the offset of the enhanced restaurant and bar area compensates for the removal of the roof deck is a factual issue. Defendants, unlike plaintiffs, have provided competent evidence in support of their request for summary judgment to establish that the hotel amenities building redesign was neither material nor adverse, and, moreover, was a value *additive* change. Mr. Haberman, Mona Lisa's managing member, in his affidavit,[242] provides insight into Mona Lisa's decision making process, and gives two main reasons Mona Lisa chose to eliminate the rooftop deck. First, he states that Mona Lisa's architects and professional management company recommended it add more space on the first and second floors.[243] Applicable Osceola County zoning provisions, however, required reallocating the "usable" space from somewhere else in the building to those areas. Second, Haberman states that other applicable building codes would have required Mona Lisa to build a 42 inch tall, solid safety wall around the perimeter of the roof deck, which would have greatly reduced the view of the pool deck below and made the rooftop area less aesthetically pleasing. Thus, Mona Lisa's design team decided to reallocate the usable space from the rooftop deck to the first and second floors of the building. Haberman further states that this redesign cost Mona Lisa an additional "several hundred thousand dollars to complete," but that it decided to spend the extra money because its experts believed the changes *added* value to the overall development.[244]

Mona Lisa has provided convincing evidence that the changes, while perhaps material, were certainly not adverse to buyers. Under Rule 56(e), plaintiffs then had the burden to come forward with some facts, affidavits, or other evidence to establish a genuine issue of material fact

---

[242] Doc. No. 121.
[243] Doc. No. 121 at ¶ 33.
[244] *Id.* at ¶ 39.

for trial. In response, however, plaintiffs did not submit anything to rebut Haberman's statements that the change increased the value of the project. Nowhere does plaintiffs' expert, Daniel Robinson, opine that the overall value of the hotel amenities building was adversely impacted as a result of the redesign.[245] Plaintiffs have failed to raise any credible factual allegations that would establish a genuine issue as to whether the redesign of the hotel amenities building was materially adverse. The Court, therefore, finds that a reasonable buyer in this case would not find the changes so significant that they would alter the buyer's decision to purchase a unit in the Mona Lisa development. If anything, based on Mr. Haberman's affidavit, the changes made buying a unit *more* attractive to a reasonable buyer. Accordingly, defendants are entitled to summary judgment in their favor on this part of Count IX.

Defendants also are entitled to summary judgment as to plaintiffs' claim that it failed to deliver a prospectus and disclosure statement with all exhibits.[246] All plaintiffs executed their respective purchase contracts acknowledging receipt of these documents that they now claim they did not receive.[247] Under Florida law, when a buyer signs a contract acknowledging the receipt of all required documents, and then later claims a developer did not provide them, "he is bound by the contract's terms and cannot rescind."[248] Plaintiffs have failed to produce any facts or evidence to support their claim of missing exhibits. By signing and acknowledging receipt of the required documents, Mona Lisa was not put on notice of a potential problem, and plaintiffs lost their rights to void their contracts on this basis. Defendants are entitled to summary judgment as to Count IX.

---

[245] Doc. No. 46.
[246] Doc. No. 177 at ¶ 254–55.
[247] *Chalfonte Dev. Corp. v. Rosewin Coats, Inc.*, 374 So.2d 618, 619 (Fla. App. 4th Dist. 1979).
[248] *Id.*

### Mona Lisa Made No Materially False
### or Misleading Representations (Count X)

Florida Statute § 718.506 provides condominium purchasers a cause of action for rescission of a condominium purchase agreement when a purchaser reasonably relies on any false material statement by a developer. To state a cause of action for rescission under Fla. Stat. § 718.506, a party must establish: (1) a false or misleading statement; (2) the statement was published in promotional materials; (3) the statement was material; and (4) reliance on the statement was reasonable.[249] In Count X, plaintiffs allege that Mona Lisa made false material statements in its promotional materials concerning the size of the pool deck, the presence of a rooftop observation deck, and various other alleged misrepresentations concerning the size of the units, the development design, and the cost of monthly assessments. The Court previously addressed these alleged violations in its first summary judgment opinion.[250] Plaintiffs have supplied no additional evidence to support any of their current allegations. Plaintiffs also allege Mona Lisa falsely represented that the units would be furnished with all appliances, furniture, and decorative items, which plaintiffs also fail to support with any facts.

As to the size of the pool deck, plaintiffs' claim is unfounded because, as the Court already has found, the size of the pool deck *is* as represented in the Prospectus. Plaintiffs' argument is based entirely on the fact that the Prospectus promised a pool deck of approximately 23,500 square feet, and the pool deck as built is comprised of approximately 12,036 square feet of hard concrete pavers and about 11,500 square feet of landscaping features. But, again, nothing in the Prospectus promised 23,500 square feet of un-landscaped, bare deck space. The pool deck was built exactly to the specifications provided to plaintiffs in the Prospectus. The Court

---

[249] *Kaufman v. Swire Pacific Holdings, Inc.,* 675 F. Supp.2d 1148, 1152 (S.D. Fla. 2009).

[250] *Mona Lisa,* 436 B.R. at 205.

accordingly finds that Mona Lisa's statements regarding the pool deck were not false or misleading in any way.

As to the rooftop deck allegations, Mona Lisa's statements were not false or misleading because Mona Lisa did intend to build, at the time the representations were made, a rooftop deck. A statement is false or misleading only if it was false or misleading at the time it was made.[251] As Haberman explains in his affidavit, Mona Lisa did originally plan to build a rooftop deck, as shown in the building plans included within the Prospectus, so the statement was not false when it was made. Later, as discussed above, Mona Lisa decided to change the design of the hotel amenities building to enhance its value, at significant expense to Mona Lisa. Haberman makes clear that Mona Lisa's design team made these changes to *add* value to the project at *no* additional cost to plaintiffs, not to skimp on building costs. Plaintiffs have not provided any facts or evidence to contradict Haberman's explanation. The Court accordingly finds that Mona Lisa never made a false or misleading statement to plaintiffs by advertising a rooftop deck.

Plaintiffs next allege that Mona Lisa made material misstatements in its promotional materials concerning the size of the units, the design of the development,[252] and the amount of monthly condominium owners' association fees.[253] Plaintiffs contend that at the time Mona Lisa provided this information, "[Mona Lisa] knew, or should have known, that the information was false and would be changed as reflected in the amendments and changes made by Mona Lisa in

---

[251] Although neither the statute nor Florida case law under § 718.506 provide any guidance on the issue of what constitutes a "false" or "misleading" statement, courts generally find that similar statutes require that the representor knew or should have known the statement was false or misleading at the time it was made. *See, e.g., Rollins, Inc. v. Butland*, 951 So.2d 860, 877 (Fla. App. 2d Dist. 2006) (finding misleading advertising [under § 817.41] is a particularized form of fraud requiring plaintiffs to prove each of the elements of common law fraud in the inducement); *Joseph v. Liberty Nat. Bank*, 873 So.2d 384, 388 (Fla. App. 5th Dist. 2004) (finding § 817.41 requires plaintiff to prove representor knew or should have known falsity of statement, as when proving fraud in the inducement).

[252] Specifically, that (1) the units would be part of a development totaling three buildings; (2) the development would include an on-site, high-end restaurant and bar with over 6,000 square feet and additional outdoor patio seating in the courtyard; and (3) the development would include over 3,000 square feet of reception and meeting space.

[253] Amended Complaint at ¶¶ 159–180, Doc. No. 10.

the Declaration of Condominium of Mona Lisa at Celebration, a Condominium Hotel recorded on October 26, 2007 in the Osceola County, Florida, Official Records at Book 03585 ... and the final as built condition." But, other than changes related to the hotel amenities building redesign, the 2007 Declaration of Condominium[254] does not differ in any respect from the 2005 Declaration of Condominium that was included with the Prospectus.[255] Each Declaration shows identical unit sizes and identical percentage condominium assessments for each unit. The only changes to the architectural drawings are related to the hotel amenities unit redesign, which removed the roof deck and added space on the first and second floors of the building. There is also no question that Mona Lisa has built three buildings, including a hotel amenities building that includes a high-end restaurant and bar with over 6,000 square feet and patio seating, and which includes over 3,000 square feet of reception and meeting space.[256] Plaintiffs' allegations to the contrary are unsupported by the undisputed facts.

Plaintiffs' contention that a material issue of fact exists as to whether the units were actually built to specifications also is not supported by any evidence. Plaintiffs have simply alleged that it is *possible* the units were not built to specifications and request time to examine the units; but they cannot establish a genuine issue of material fact for trial on bare allegations alone. Under Rule 56, on a motion for summary judgment, conclusory allegations—without specific supporting facts—have *no* probative value.[257] Plaintiffs thus must present some specific factual allegations to raise a legitimate question of fact as to whether the units were built to specifications. Other than continue to speculate that Mona Lisa *may* have built certain units differently than represented, they have supplied no credible evidence, even though they have had

---

[254] Doc. No. 46 Ex. 9; Doc. No. 89 Ex. 1.
[255] *Compare* 2005 Declaration of Condominium and 2007 Declaration of Condominium.
[256] *See* Doc. No. 125 at ¶ 5.
[257] *Evers v. General Motors Corp.* 770 F.2d 984, 986 (11th Cir. 1985).

more than ample time to inspect the units. Defendants, on the other hand, have provided ample evidence that verifies the units were all built exactly as represented in the Prospectus.[258]

Lastly, plaintiffs for the first time claim Mona Lisa falsely represented that the units would be furnished with all appliances, furniture, and decorative items to be selected by Mona Lisa.  Again, plaintiffs provide no facts as to what furnishings are missing or how any missing furnishings, if any, materially or adversely affected plaintiffs' ownership interests.

None of plaintiffs' allegations in Count X are supported by any facts that would establish a genuine issue of fact that Mona Lisa made any false or misleading statements in its promotional materials. The Court will enter summary judgment in favor of defendants as to Count X.

**Factual Issues Exist as to**
**Plaintiff Lieberman's Unique Claims (Counts XVII-XX)**

Ms. Lieberman, a plaintiff in the Bennett Adversary Proceeding, makes additional allegations in Counts XVII - XX that she is entitled to rescission due to Mona Lisa's misrepresentations about her specific unit. She claims Mona Lisa either falsely, fraudulently, negligently, or mistakenly represented that, for a cost upgrade, she would be receiving a unit with a pool view, when in fact, the cabana-style restrooms obstruct her view of the pool.[259] Only defendants have moved for summary judgment.  Lieberman's allegations raise genuine issues of material facts.  Evidence is needed to determine (1) whether the unit has an obstructed view, (2) whether Mona Lisa made any misrepresentations negligently or with the intent to deceive, and

---

[258] Doc. No. 125, at ¶ 5.

[259] These allegations appear in Counts XVI (false misrepresentation under FDTUPA § 501.201 ), Count XVII (fraudulent misrepresentation), Count XIX (negligent misrepresentation), and Count XX (unilateral mistake) of plaintiffs' Second Amended Complaint (Doc. No. 32 in 9-ap-859).

(3) whether Ms. Lieberman justifiably relied upon them.[260] Due to the factual issues which

preclude summary judgment as a matter of law, the Court will deny defendants' request for

summary judgment as to Counts XVII – XX.

### Defendants are Entitled to Partial Summary Judgment as to Per Se Violations of the Florida Deceptive and Unfair Trade Practices Act (Counts XI, XII, and XIII)

The Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA") provides that a

violation of any law, statute, rule or ordinance that proscribes unfair methods of competition, or

unfair, deceptive, or unconscionable acts or practices, is a per se violation of FDUTPA.[261] To

recover under a FDTUPA claim, a plaintiff must show "(1) a deceptive act or unfair practice; (2)

causation; and (3) actual damages."[262]  In Florida, deception occurs if a defendant engages in a

practice that is likely to "mislead the consumer acting reasonably in the circumstances, to the

consumer's detriment," which requires a showing of probable, not possible, deception.[263]

Plaintiffs assert three counts raising per se FDUTPA violations—Counts XI, XII, and

XIII.  In Count XI, plaintiffs have alleged per se violations of FDUTPA based on the alleged

violations of ILSFDA (Counts I – IV), § 77e of the 1933 Securities Act (Count V), Fla. Stat. §

517 (Count VI), Fla. Stats. §§ 718.202 (Count VII), 718.502(Count VIII) 718.503 (Count IX),

718.506 (Count X).  In Count XII, plaintiffs have alleged per se violations of FDUTPA under

Fla. Stat. 190.048.  In Count XIII, plaintiffs have alleged per se violations of FDUTPA under 16

---

[260] A FDUTPA claim requires (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Bookworld Trade, Inc., v. Daughters of St. Paul, Inc.,* 532 F.Supp.2d 1350, 1364 (M.D. Fla. 2007) (citation omitted). To state a claim for negligent misrepresentation, Florida law requires a plaintiff to allege: "(1) misrepresentation of a material fact; (2) that the representor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known of its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation." *Holguin v. Celebrity Cruises, Inc.,* 2010 WL 1837808, *1 (S.D. Fla. 2010). Fraudulent misrepresentation in Florida requires: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem,* 44 So.3d 102, 105 (Fla. 2010). Note that justifiable reliance is *not* an element of fraudulent misrepresentation. *Specialty Marine & Industrial Supplies, Inc. v. Venus,* 66 So.3d 306, 310 (Fla. App. 1st Dist. 2011).
[261] Fla. Stat. § 501.201 *et seq.*
[262] *In re Florida Cement and Concrete Antitrust,* 746 F. Supp.2d 1291, 1320- 21 (S.D. Fla. 2010).
[263] *Zlotnick v. Premier Sales Group, Inc.,* 480 F.3d 1281, 1284 (11th Cir. 2007) (citations omitted).

CFR § 460.16 (Count XIII). Defendants are entitled to summary judgment as to Counts XII and XIII, and for the majority of Count XI. Summary judgment is premature and therefore denied as to Mona Lisa's possible violation of 15 U.S.C. § 1703(c) (ILSFDA) until the Court determines whether or not the units are "lots."

## Predicate Claims – ILSFDA (Count XI)

Plaintiffs are correct that any violation of ILSFDA, a consumer protection statute, is a *per se* violation of FDUTPA.[264] Failing to include notice of plaintiffs' two-year automatic rescission rights can be classified as an unfair, unconscionable, or deceptive practice for which FDUTPA was designed to prevent. Plaintiffs already have established that they were harmed by Mona Lisa's failure to include notice of their automatic two-year revocation rights. A factual issue remains, however, as to whether the units are "lots" and whether ILSFDA even applies.[265] Because this material factual dispute exists, the defendant is not entitled to summary judgment as a matter of law.

All of the plaintiffs' other FDTUPA claims relying on ILSFDA fail, however, because plaintiffs cannot establish a predicate violation under ILSFDA. First, no other predicate ILSFDA violation exists because plaintiffs' claims either are time barred or their purchase contracts are exempt.[266] Nonetheless, plaintiffs argue that, because the Court in part bases its holding under ILSFDA on plaintiffs' claims being time-barred, the Court should, for purposes of FDUTPA, look at Mona Lisa's underlying conduct *without regard to ILSFDA's statute of limitations* and find a violation of ILSFDA to serve as a predicate violation of FDUTPA. In other words, plaintiffs argue that conduct that violates ILSFDA's substantive provisions can constitute a per se

---

[264] Doc. No. 39 in 9-ap-859. *Prato v. Hacienda Del Mar, LLC*, 2011 WL 161787 (M.D. Fla. Jan. 18, 2011) (citing *Trotta v. Lighthouse Point Land Co., LLC*, 551 F. Supp.2d 1359, 1367 (S.D. Fla.2008) (*rev'd* on other grounds); *Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299 (11th Cir. 2008)).
[265] Fla. Stats. § 501.207; § 501.211(2) & § 501.2105.
[266] There can be no *per se* violation of FDUTPA based on alleged but unfounded violations of ILSFDA. *Mona Lisa*, 436 B.R. at 208.

violation of FDUTPA, *even when* that conduct occurred beyond the applicable statute of limitations.[267]

The argument to ignore the applicable statute of limitation is meritless. The basis for a court's holding under a predicate statute is of no significance for purposes of FDUTPA. A party either has or does not have a claim under a predicate statute. In this case, the buyers' ILSFDA claims are largely time-barred. They do not have a claim. The reason is irrelevant; the claim is extinguished for all purposes, including serving as a predicate act for FDUTPA. Plaintiffs cannot establish a per se violation of FDUTPA based on alleged but unfounded violations of ILSFDA. As such, defendants are entitled to partial summary judgment under Count XI on all ILSFDA issues alleged to serve a predicate act under FDTUPA, other than the one issue relating to the disclosure of the plaintiff's two year rescission rights to which factual disputes exist.

## Other Predicate Acts (Count XI)

Plaintiffs also have alleged predicate violations under the 1933 Securities Act, Florida Chapter 517, and the Florida Condominium Act, Fla. Stat. §§ 718.202, 718.503, 718.504, and 718.506. None of these statutes can serve as predicate violations for a claim under FDUTPA. First, the statutes simply do not proscribe unfair methods of competition and are not encompassed within the penumbra of consumer protection statutes covered by FDUTPA. They instead govern the use of plaintiffs' deposits held in escrow and other technical requirements unrelated to any unfair or deceptive trade practice.[268]    Certainly, Mona Lisa was required to follow these provisions, and the statutes absolutely protect purchasers; however, the protection

---

[267] Plaintiffs cite *Semtek Int'l, Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 504, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) and a number of similar Florida cases for the proposition that the "expiration of the applicable statute of limitations merely bars the remedy and does not extinguish the substantive right." But they cherry-picked this quotation from the middle of a longer sentence having to do with claim-preclusion. Neither the sentence fragment nor the complete sentence supports plaintiffs' argument.
[268] *Id.* (citing *Double AA,* 674 F. Supp.2d at 1357; *Edgewater By the Bay, LLLP v. Gaunchez,* 419 B.R. 511 (Bankr. S.D. Fla. 2009).

they provide is totally unrelated to the scope of FDUTPA that is designed to protect purchasers from unfair competition or deceptive trade practices.[269] For example, Mona Lisa's requirement to submit the Updated Purchase Agreements to the Division for approval (as asserted in Count VIII) is not tantamount to deceptive conduct likely to cause injury to the plaintiffs. Plaintiffs who signed the Updated Purchase Agreement clearly were aware of the terms in the agreement insofar as they signed the contract.  Plaintiffs do not explain how Mona Lisa's failure to submit the amended agreement to the Division was deceptive, how they were harmed, or what damages they incurred. This violation of § 718.502 was merely technical. Therefore, no per se violation exists for which plaintiffs can bring a FUDTPA claim under § 718.502.

Second, in accordance with the Court's rulings above, plaintiffs cannot establish a predicate violation under the 1933 Securities Act, Florida Chapter 517, or Fla. Stats. §§ 718.503, 718.506.  The Court already has held that Mona Lisa did not violate any of these statutes and, therefore, no predicate act exists.   As such, defendants are entitled to summary judgment as to Count XI as to claims plaintiffs argue arose from any non-ILSFDA statute.

### Mona Lisa is Not Bound by
### Community Development District Requirements (Count XII)

Plaintiffs next claim in Count XII that Mona Lisa violated Fla. Stat. § 190.048, which is a per se FDUTPA violation.  Florida Statute § 190.048 requires a developer to disclose to purchasers that their units are located in and subject to a Community Development District. Fla. Stat. § 190.048 is inapplicable in this case, however, for an obvious reason—Mona Lisa is not selling residential units within a Community Development District.[270]  Plaintiffs have not offered any evidence to support their claim that units are located within a Community Development

---

[269] *In re Samuels*, 176 B.R. 616, 628 (Bankr. M.D. Fla. 1994); *Suris v. Gilmore Liquidating, Inc.*, 651 So. 2d 1282, 1283 (Fla. Dist. Ct. App. 3d 1995).

[270] Doc. No. 65 in 9-ap-770. Mona Lisa maintains "[n]one of Mona Lisa's Purchase Contracts with buyers contain the language set forth in Florida Statutes § 190.048 because Mona Lisa did not offer "residential" units for sale within a Community Development District."

District, and now actually "acknowledge that [d]efendant is entitled to summary judgment regarding this portion of Plaintiff's FDUTPA claim."[271]

Accordingly, Mona Lisa has not violated § 190.048, because it does not apply. Plaintiffs cannot establish a per se FDUTPA violation using this statute to establish a predicate act. Defendants are entitled to summary judgment under Count XII.

### Mona Lisa Made Required Insulation Disclosures - Count XIII

Similarly, plaintiffs cannot establish a per se violation under Count XIII.  16 CFR § 460.16 requires a developer to disclose the thickness and R-value of the insulation used in construction in plaintiffs' contracts.[272] Plaintiffs have provided no evidence to support their claim that Mona Lisa failed to make this required disclosure.   Indeed, plaintiffs "now acknowledge that Defendant is entitled to summary judgment regarding this portion of Plaintiff's FDUTPA claim."[273]  Summary judgment is granted in favor of the defendants on Count XIII.

To summarize, summary judgment is denied as to Mona Lisa's ILSFDA violation for failure to disclose plaintiffs' two year revocation rights until the issue of "lots" is determined (Count XI). Defendants are entitled to summary judgment as to all plaintiffs' other FDUTPA claims in Counts XI, XII, and XIII because plaintiffs have failed to establish a predicate violation.

### Mona Lisa had No Disclosure Obligation
### under Florida Statute § 720.401(1)(a) (Count XIV)

Plaintiffs claim in Count XIV that Mona Lisa violated Fla. Stat. § 720.401(1)(a) by failing to include a disclosure summary revealing that each plaintiff's unit is located within a

---

[271] Doc. No 61 at ¶67 in 9-ap-859.
[272] 16 C.F.R. § 460.16 requires sellers of new homes to provide the thickness, and R-value of the insulation that will be installed in each part of the house.
[273] Doc. No. 61 in 9-ap-859.

community subject to an association membership.[274] In Florida, developers must make this disclosure to all prospective parcel owners before they execute a contract for sale.[275] If such disclosure is not provided and made conspicuous, the contract is voidable by the buyer.[276] This section does not apply, however, to any association regulated under Chapter 718, 719, 721, or 723, nor does it apply if the association disclosure "is otherwise made in connection with the requirements of chapter 718, chapter 719, chapter 721, or chapter 723."[277]

Neither party disputes that the Florida Condominium Act contained in Chapter 718 of the Florida Statutes applies to Mona Lisa because the development is a "condominium created and existing" in the state of Florida.[278] Therefore, § 720.401 simply does not apply. Even if it did, plaintiffs' purchase contracts comply with the exception and include notice of an association membership in Section 15.[279] The disclosure need not be in a form substantially similar to that provided in § 720.401(1)(a).    Defendants are granted summary judgment in their favor as to Count XIV.

### Mona Lisa Breached Its Contractual Obligations (Count XV)

In Count XV, plaintiffs allege Mona Lisa breached the purchase agreements by (1) failing to provide purchasers with the legal opportunity to close on the Estimated Closing Date, (2) failing to use plaintiffs' deposits in accordance with the Florida Condominium Act, and (3) making material misrepresentations regarding the development's amenities.[280]   The Court will

---

[274] Fla. Stat. § 720.401(1)(a).

[275] *Id*.

[276] Fla. Stat. § 720.401(c).

[277] *Id* (emphasis added). *See Florida Farm, LLC v. 360 Developers, LLC*, 45 So.3d 810 (Fla. App. 3d Dist. 2010).

[278] Fla. Stat. § 718.102 ("Every condominium created and existing in this state shall be subject to the provisions of this chapter.").

[279] "Purchaser, by virtue of ownership of the Unit, shall automatically become a member of the Association, and shall be obligated to pay assessments and other fees and charges in accordance with the Declaration and exhibits thereto, described elsewhere in this Contract or in materials delivered to Purchaser contemporaneously with or prior to the Effective Date of this Contract." (Doc. No. 125 Exhibit 7).

[280] Doc. No. 177 at 58-62.

address each argument in turn, and grant summary judgment in favor of the plaintiffs on Count

XV, with the exception of the last allegation.

**Mona Lisa Breached the Original Purchase Agreements**
**by Failing to Properly Notify Plaintiffs of Changes to the Estimated Closing Date**

Plaintiffs argue that Mona Lisa breached the Original Purchase Agreements by failing to

close on the Estimated Closing Date. Specifically, plaintiffs claim time was of the essence for

Mona Lisa to close on the Estimated Closing Date, and, alternatively, Mona Lisa failed to

provide plaintiffs with appropriate notice of delays in the Estimated Closing Date by certified

mail as required by the purchase contracts.  Defendants argue in response that plaintiffs' breach

of contract claim fails as a matter of law because the Estimated Closing Date was only an

estimate, Mona Lisa reserved the right in Paragraph 8(a) of the purchase agreements to delay

closing for any reason, and plaintiffs cannot show damages. The Court will address both parties'

arguments in turn.[281]

Under Florida law, the elements of a breach of contract claim are (1) a valid contract, (2)

a material breach, and (3) damages, unless proof of damages is altered by the parties'

agreement.[282] When a contract fails to specify a time for performance, the law will imply a

reasonable time by which the contract should have been performed.[283] As in this case,

performance, under Florida law, is not complete until a developer obtains a certificate of

---

[281] Plaintiffs appear to have dropped their argument that Mona Lisa breached Paragraph 3 of the Updated Purchase Agreements by failing to complete construction of the units within two years after the dates the agreements were signed. Mona Lisa obtained its Certificate of Occupancy on May 7, 2008. Doc. No. 26 in Adversary Proceeding No. 9-859. Even assuming that Mona Lisa finished construction on May 7, 2008, the latest date by which Mona Lisa could have finished construction, no plaintiff signed the Updated Purchase Agreement before May 7, 2006. Therefore, because all of the plaintiffs who signed the Updated Purchase Agreement did so on or after May 29, 2006, no plaintiff can claim that Mona Lisa breached Paragraph 3 of the Updated Purchase Agreement.  Mona Lisa timely completed construction.
[282] *Border Collie Rescue, Inc. v. Ryan*, 418 F.Supp.2d 1330, 1342-43 (M.D. Fla. 2006).
[283] *Denson v. Stack*, 997 F. 2d 1356, 1361 (11th Cir. 1993).

occupancy and the buyer is able to close[284] and occupy the unit.[285] Unless specifically provided by contract, time is *not* of the essence in contracts for the sale and purchase of real estate.[286] When time is not of the essence for closing under a real estate contract, a party can breach by failing to timely close only by refusing to perform after the other party demands that a closing take place within a reasonable time and place.[287]

The disputed time of the essence provision in the purchase agreements, Paragraph 26, reads in full:

> Time is of the essence for making all payments due under this Contract, *and for the closing of this transaction.* Time for Purchaser's performance of all other obligations hereunder may be made of the essence by Seller giving not less than five (5) days' advance written notice to Purchaser." (Emphasis added).

Plaintiffs contend that the Estimated Closing Dates specified in Paragraph 8(a) of the purchase agreements[288] are by law the reasonable dates by which Mona Lisa was required to obtain and deliver a certificate of occupancy for the units, citing *Harvey v. Lake Buena Vista Resort, LLC.*[289] But that case involved purchase agreements with a firm two-year completion deadline. Indeed, *Harvey* found a breach of contract when the developer obtained a certificate of occupancy a mere four days after the absolute deadline for completion specified in the purchase agreements.[290]

Here, the Original Purchase Agreements had no firm commitment to close on the Estimated Closing Date. Paragraph 8(a) of the purchase agreements expressly allows Mona Lisa

---

[284] Plaintiffs also argue that they could not legally close on their units because Mona Lisa failed to properly update the relevant declaration of condominium after it completed construction as required by § 718.104(4)(e) of the Florida Statutes. The Court finds that the plaintiffs' claim on this point is untimely pursuant to § 718.110(10) and is moot, given the undisputed fact that numerous other non-plaintiff purchasers have closed on their units. *See*, Haberman Declaration, Doc. No. 65 in Adversary Proceeding No. 9-770.

[285] *Hollander v. K-Site Assocs.*, 630 So.2d 1153, 1154 (Fla. App. 3d Dist. 1993).

[286] *Henry v. Ecker*, 415 So.2d 137, 140 (Fla. App 5th Dist. 1982).

[287] *Id.*

[288] The Original Purchase Agreements specified April 30, 2007, as the Estimated Closing Date, while the Updated Purchase Agreements specify either July or September 2007, as the Estimated Closing Date.

[289] 568 F.Supp.2d 1354, 1366 (M.D. Fla. 2008).

[290] Although the contracts also specified an estimated closing date, the court in *Harvey* found a breach of contract when the developer failed to complete construction by the mandatory two-year deadline.

to delay closing until "such later date ... as may be set by Seller." The Court cannot find that the Estimated Closing Date was, as a matter of law, the date by which Mona Lisa was required to close. Given that Mona Lisa could extend the closing date at will, the Court cannot find that time was of the essence as implied by Paragraph 26 of the purchase agreements. If time was *not* of the essence, plaintiffs, under Florida contract law, need to establish they demanded performance from Mona Lisa within a reasonable time and that Mona Lisa then failed to perform.[291]

To support its claim that time was not of the essence, Mona Lisa argues a reasonable developer would not have committed to a defined closing date in a contract because delays are common and expected in the construction industry.[292] This claim is supported by the affidavit of Charles D. Brecker,[293] an expert in the construction and development, who affirms that it is common for a developer to expect delays due to unforeseen contingencies in a large development project such as design changes, permit delays, contractor and subcontractor staffing issues, material shortages, and more.  Plaintiffs have presented nothing, other than referencing the contractual language, to dispute Mona Lisa's position that the time was *not* of the essence. The Court therefore concludes that, as to the Original Purchase Agreements, time was not of the essence on the closing date.[294]

Plaintiffs next argue Mona Lisa breached Paragraph 8 of the Original Purchase Agreements by failing to properly and timely give the required fifteen days' notice to the

---

[291] *Id*.
[292] Doc. No. 208 at 73-76.
[293] Doc. No. 44 in 9-ap-859 Affidavit of Charles D. Brecker.
[294] Finding that the Estimated Closing Date in the Original Purchase Agreements was flexible and that time was not of the essence, plaintiffs then had the obligation to demand Mona Lisa deliver their units in a timely fashion and demonstrate that Mona Lisa thereafter failed to perform.  Plaintiffs never made any such demands, and, as such, now cannot demonstrate that Mona Lisa failed to timely deliver any units.

plaintiffs of any extension of the Estimated Closing Date.[295] Paragraph 16 of the Original Purchase Agreements provides that all notices be sent via U.S. certified mail.

Many plaintiffs have sworn they never received a single notice from Mona Lisa extending the Estimated Closing Date.[296] Others argue "defendant repeatedly rescheduled the Estimated Completion Date to a later date…[e]ach time Defendant rescheduled the Estimated Closing Date, Defendant failed to notice me in a manner required by Paragraph 16 of the subject purchase agreement…[and] Defendant failed to provide me notice of the delay in the 'Estimated Closing Date' in 'writing and sent by United States certified mail….'"[297] Nothing in the record supports a finding that Mona Lisa served *any* notice addressed to a particular purchaser by U.S. certified mail, although some plaintiffs indeed may have received informal notices over the years.

Mona Lisa claims that it repeatedly notified plaintiffs of the delays in construction and closing;[298] the record however is woefully lacking in any support for this bare allegation.  The email and letter communications Mona Lisa offers as evidence to support its position are inadequate.[299] The emails show only that a Mona Lisa representative, Cynthia Madsen, sent emails to herself, in what appear to be blind copies that may have gone to various purchasers.[300] Although the text in the emails is directed at the purchasers and discusses changes to the Estimated Closing Date, none of the emails were addressed to any particular purchaser, nor do they conform to the notice requirements of Paragraph 16 that all notices be sent via U.S. certified mail.

---

[295] Doc. No. 47 at ¶ 15 in Case No. 9-ap-859; Doc. No. 57 at 17 in 9-ap-770.
[296] *See eg.* Doc. No. 203 at 9, Plaintiffs' Affidavits in which plaintiffs allege: "there is absolutely no evidence that any of the Plaintiffs had actual and timely notice of any changes in the Estimated Closing Date or that any of the plaintiffs waived any of their contractual rights."
[297] Doc. No. 70 at ¶ 36-37 in 9-ap-859.
[298] Doc. No. 208 at 81.
[299] See Doc. No. 49 at 81 in 9-ap-49 listing "examples" of communications sent to plaintiffs."
[300] Doc. No. 45 Exhibit 9 in 9-ap-859.

Similarly, none of the letters sent via Fed Ex were addressed to any particular plaintiff. They are all addressed to "Buyer" and offer no address or contact information whatsoever.[301] As such, Mona Lisa has failed to establish that it actually sent these notices or whether any purchasers actually received them. All of the factual issues would have been resolved if Mona Lisa has just done what it promised—to serve notices of any extension of the Estimated Closing Date by U.S. Certified Mail to each individual purchaser. Mona Lisa has failed to rebut the plaintiff's affidavits in even one case. Mona Lisa certainly breached Paragraph 16 of the purchase contracts requiring all notices to be sent by certified mail. Plaintiffs are granted summary judgment as to their breach of contract claim on Count XV.

Contrary to Mona Lisa's contention, plaintiffs are not required to prove they were harmed by this breach. As plaintiffs point out, Paragraph 13 of the purchase agreements gives the purchasers the right to terminate the contract and receive a full refund of all deposits paid in the event Mona Lisa fails to perform its obligations under the contract.[302]

## Mona Lisa Breached the Purchase Agreements
## by Improperly Handling Plaintiff's Escrow Deposits

Plaintiffs next argue that, as asserted in Count VII, Mona Lisa improperly used and failed to properly segregate plaintiffs' deposits and failed to account for them properly, which also constitutes a breach of contract because Paragraphs 1, 7, and 8(a) of the purchase agreements similarly restrict Mona Lisa from using the deposits in violation of Fla. Stat. § 718.202. The Court already has held above that Mona Lisa indeed did fail to comply with § 718.202, and Mona Lisa is liable to the plaintiffs for the return of the deposits with interest and the payment of reasonable attorney fees and costs. The Court now extends that ruling to conclude that the same

---

[301] *Id.*
[302] *Mona Lisa*, 436 B.R. at 210.

violation constitutes a breach of contract for which the plaintiffs are entitled to similar relief. Plaintiffs are granted summary judgment as to this portion of Count XV.

### Mona Lisa However Did Not Breach the Purchase Agreements by Making any Materially Adverse Changes

Plaintiffs next assert that the allegations regarding Mona Lisa's misrepresentations regarding aspects of the condominium development (i.e., the size of the pool deck and elimination of the rooftop deck), which formed the basis for their claims under Count IX, also establish a breach of contract because Paragraph 27(g) of the purchase agreements mirrors the statutory language of Fla. Stat. § 718.503. Because the Court has ruled in favor of defendants on Count IX, determining that the allegedly material adverse changes were not in fact adverse, the Court also has determined that Mona Lisa did not breach Paragraph 27(g) of the purchase agreements. On this point, defendants are entitled to partial summary judgment as to this part of Count XV.

### Declaratory Relief (Count XVI)

In Count XVI, plaintiffs seek declaratory relief finding that (1) SunTrust, the escrow agent, is liable to the plaintiffs for any amounts awarded by the Court; (2) Westchester, issuer of the surety bond, similarly is liable to plaintiffs for any amounts awarded by the Court; (3) plaintiffs' deposits are not Mona Lisa's property or property of Mona Lisa's bankruptcy estate; and (4) plaintiffs are entitled to the immediate return of their full deposits, plus interest, attorney fees, costs, and any other relief the Court may deem just and proper.

### SunTrust is not Liable to Plaintiffs

As discussed earlier in the analysis of Count VII, SunTrust did fail to comply with the terms of the escrow agreement[303] until February 2006, when it first properly segregated

---

[303] Doc. No. 125, Exhibit 1.

plaintiffs' deposits in compliance with the Florida Condominium Act. Regardless, § 718.202 "does not authorize a private cause of action against an escrow agent. The statute clearly sets forth the rights and obligations of only *developers*, not escrow agents, regarding the treatment of deposits made by condominium buyers . . . and provides for no remedy against the escrow agent."[304]   Therefore, SunTrust is not liable to plaintiffs.  Defendants, and specifically SunTrust, are granted summary judgment as to this part of Count XVI.[305]

### Westchester Must Pay Plaintiff's Deposits under the Surety Bond

Plaintiffs next argue that Westchester, as a matter of law, must pay the amounts of any deposits the Court awards in these proceedings.  The Court agrees.  Paragraph 4 of the surety agreement obligates Westchester to pay the full amount of plaintiffs' deposits that Mona Lisa fails to pay.[306]

> When PRINCIPAL [Mona Lisa] fails to refund deposits as required by Chapter 718, Florida Statutes, and/or agreements with buyers, ESCROW AGENT [SunTrust] or the DIVISION may declare this Bond in default and *SURETY* [Westchester] is required to disburse funds in the amount of refund deposits that are due and payable, within 30 days by SURETY, as a debt to ESCROW AGENT or DIVISION, the amount being payable subject to any reductions in the face amount calculated pursuant to Paragraph 5 herein.[307]

Westchester argues that the recital clauses of the surety agreement limit Westchester's obligation to pay only the amount of plaintiffs' deposits equal to or less than 10% of the purchase price.[308] The Court disagrees. In Florida, operative clauses of a contract prevail over recital clauses and 'whereas' clauses when a conflict arises between the two.[309] Paragraph 4 of the surety agreement is an operative clause and clearly requires Westchester to pay all of the

---

[304] *Double AA Intern Inv. Group Inc., v. Swire Pacific Holdings, Inc.,* 637 F.3d 1169, 1171 (11th Cir. 2011) *(citing United Auto. Ins. Co. v. A 1st Choice Healthcare Sys.,* 21 So.3d 124, 128 (Fla. App. 3d Dist.  2009)).
[305] SunTrust has filed a cross-claim against Mona Lisa. Doc. No. 90. Mona Lisa has filed an answer. Doc. No. 95. The issue is not decided here because neither party has moved for summary judgment as to SunTrust's cross-claim.
[306] Doc. No. 205 at 23–24.
[307] Doc. No. 125, Exhibit 3, at ¶4.
[308] *Id.*
[309] *Johnson v. Johnson,* 725 So. 2d 1209, 1212–13 (Fla. App. 3d Dist. 1999).

deposits Mona Lisa is required to refund under Florida Statute Chapter 718 for a breach of the purchase contracts. Westchester therefore is liable to plaintiffs for *all* deposits due and payable by Mona Lisa up to the surety bond limit of $6,575,000.[310]   Mona Lisa remains liable for the interest, fees, and costs due to plaintiffs as a result of its breach of the purchase contracts and violations of the Florida Condominium Act, because Paragraph 4 of the surety bond requires Westchester to disburse funds in the amount of the *refund deposits due and payable,* not all amounts due and payable. This interpretation is supported by the underlying purpose of the surety bond in § 718.202, which is to protect the first 10% of plaintiffs' deposits from misuse. The bond is not meant to protect the developer from having to pay fees and costs incurred as a result of misusing deposits.  Instead the bond is meant to repay purchasers their deposits should a developer be required to give them back because it squandered them away, breached a purchase contract, or otherwise failed to meet its obligations. Plaintiffs are granted summary judgment in their favor as to Westchester's liability under the surety bond for the amount of the deposits, and Mona Lisa is liable for all other fees, costs, and interest.

## Deposits are Not Property of the Mona Lisa Bankruptcy Estate

Federal bankruptcy law determines what assets are included in property of a bankruptcy estate. But state law determines the extent and validity of a debtor's interest in those assets.[311] Under the Bankruptcy Code,[312] a debtor's bankruptcy estate includes "all legal and equitable

---

[310] Westchester has filed a cross-claim against Mona Lisa seeking indemnity from Mona Lisa for all amounts owed by Westchester, including fees and costs. Doc. No. 89. Mona Lisa has replied. Doc. No. 96. Neither party has filed a motion for summary judgment on this cross claim.

[311] State law determines the extent and validity of a debtor's interest in property. *In re Scanlon*, 239 F.3d 1195, 1197-98 (11th Cir. 2001); *Butner v. United States*, 440 U.S. 48, 54 (1979).

[312] All references to the Bankruptcy Code refer to 11 U.S.C. § 101 *et seq.*

interests of the debtor in property as of the commencement of the case."[313]A bankruptcy estate cannot succeed to a greater interest in property than a debtor holds prior to bankruptcy.[314]

Whether the deposits become property of the estate depends on the nature of the escrow agreement.[315] For example, in cases where an escrow arrangement operates to create an assurance that funds will be used for a particular purpose, the escrow funds generally are not property of the estate.[316] This is true in Florida, where legal title to deposits placed in an escrow account "remains with the purchasers *until the occurrence of the conditions specified in the escrow agreement.*"[317] Consistent with the protective qualities inherent in an escrow agreement, a grantor retains legal interests in escrowed funds if it has the right to unwind a transaction and recover the escrowed funds.[318] For these reasons, funds in escrow do not become property of a grantee until they are *irretrievably* placed beyond the grantor's reach.[319]

Plaintiffs argue their deposits are not property of Mona Lisa's bankruptcy estate.[320] No dispute exists that the escrow accounts in question were created to reassure purchasers that Mona Lisa would use their deposits to pay for expenses related to the development of the project and only as permitted by the Florida Condominium Act, in accordance § 718.202 of the Florida Statutes. Plaintiffs were entitled to retrieve their deposits if they could successfully prove Mona Lisa misused them. This they have done in connection with the discussion of Count VII above. Mona Lisa's interest in the deposits has always been subject to divestment should Mona Lisa

---

[313] 11 U.S.C. § 541(d). *See also T&B Scottsdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989); *Scanlon*, 239 F.3d. at 1197-98.

[314] Doc. No. 177 at 62-63 (citing 11 U.S.C. § 541(d) and *Butner*, 440 U.S. 48 (1979).

[315] *In re Cedar Rapids Meats, Inc.*, 121 B.R. 562, 567 (Bankr. N.D. Iowa 1990) (citing *In re Sun*, 116 B.R. 767, 771 (Bankr. D. Haw. 1990)).

[316] *In re Cedar Rapids Meats, Inc.*, 121 B.R. at 567 (citing *In re Dolphin Titan Intern., Inc.*, 93 B.R. 508, 512-13 (Bankr. S.D. Tex. 1988)).

[317] *In re Berkley Multi-Units, Inc.*, 69 BR 638 (Bankr. M.D. Fla. 1987); *Scanlon*, 239 F.3d at 1197-98; *In re Hallmark Builders, Inc.*, 205 B.R. 971, 973 (Bankr. M.D. Fla. 1996).

[318] *Dickerson v. Central Florida Radiation Oncology Group*, 225 B.R. 241, 244 (M.D. Fla. 1998).

[319] See *In re Royal Business School, Inc.*, 157 B.R. 932, 941–42 (Bankr. E.D.N.Y. 1983); *In re Dolphin Titan Intern., Inc.*, 93 B.R. 508, 512-13 (Bankr. S.D. Tex. 1988)).

[320] Doc. No. 205 at 6.

improperly use the funds.[321] Because Mona Lisa used the deposits for purposes prohibited by Florida law, Mona Lisa never gained legal title over them. Thus, the deposits never became property of the bankruptcy estate.

Plaintiffs are entitled to recover their deposits with interest, costs, and fees from Mona Lisa.[322]  Westchester, as Mona Lisa's surety, is liable to plaintiffs under the surety agreement for the lesser of the total of plaintiffs' deposits or $6,575,000.[323]  Mona Lisa is liable for all deposits, interest, fees, and costs.

## CONCLUSION

Plaintiffs are entitled to final summary judgment as to part of Count VII, Count VIII, part of Count XI, and part of count XV. Defendants are entitled to summary judgment as to Counts V, VI, IX, X, XII, XIII, XIV, and partial summary judgment as to Counts I-IV, VII, XI, and XV.

---

[321] *See In re Royal Business School*, *Inc.*, 157 B.R. 932, 940 (Bankr. E.D.N.Y 1983) (an escrow grantee has an equitable interest in property until full performance of the conditions of the escrow have been met, at which time legal title to the property in escrow will vest in the grantee).

[322] Even though plaintiffs have proven they are entitled to return of their deposits, the Eleventh Circuit has held § 718.202 does not authorize a private cause of action against an escrow agent. *See Double AA Intern. Inv. Group, Inc. v. Swire Pacific Holdings*, *Inc.*, 637 F.3d 1169, 1171 (11th Cir. 2011) (citing *United Auto. Ins. Co. v. A 1st Choice Healthcare Sys.*, 21 So. 3d 124, 128 (Fla. App. 3d Dist. 2009) (overturning *Swire*, "Absent a specific expression of legislative intent, a private right of action may not be implied.")). For the same reasons, no private cause of action under § 718.202 shall be maintained against the surety, Westchester. Plaintiffs' actions against Westchester to recover their deposits may only be based on the contractual obligations under the surety agreement.

[323] Westchester's cross claim, at Doc. No. 89, indicates that the total amount under Surety agreement is $6,750,000. However, the surety bond and rider indicate the total amount of the surety increased from $5,000,000 to *$6,575,000*. Doc. No. 125 Exhibit 3 (Rider).

Summary judgment is denied for both parties as to part of Counts I–IV, XI, and XVII-XX. A separate order consistent with this Memorandum Opinion shall be entered.

DONE AND ORDERED in Orlando, Florida, on May 16, 2012.

_____
KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

Copies provided to:

Plaintiffs' Counsel in AP 09-49 & AP 09-769:  John L. Urban, Urban Their Federer & Chinnery, PA, 200 S. Orange Avenue, Suite 2025, Orlando, FL  32801

Plaintiffs' Counsel in AP 09-770:   Mark C. Rutecki, 1420 Celebration Blvd., Suite 200, Celebration, FL  34747

Plaintiffs' Counsel in AP 09-859:   Gregory W. Stoner, 121 S. Orange Avenue, Suite 1470, Orlando, FL  32801

Counsel for Defendant Mona Lisa:  R. Scott Shuker, Latham Shuker Eden & Beaudine, LLP, P.O. Box 3353, Orlando, FL  32802

Counsel for Defendant Westchester:  Valerie Shea, Sedgwick Detert Moran & Arnold, 2400 E. Commercial Blvd., Suite 1100, Fort Lauderdale, FL  33308

Counsel for Defendant SunTrust:  John R. Stump, Swann Hadley Stump Dietrich & Spears PA, 1031 W. Morse Blvd., Suite 350, Winter Park, FL  32789

Counsel for Defendant BankFirst:  L. William Porter, III, Lowndes Drosdick Doster Kantor & Reed, PA, P.O. Box 2809, Orlando, FL  32802

Counsel for Martin Imbembo, Doreen Nelson:  Richard B. Webber, II, Zimmerman Kiser & Shutcliffe PA, 315 E. Robinson Street, Suite 600, Orlando, FL  32801

APPENDIX A - Plaintiffs who timley filed automatic rescission claims within 2 years of signing purchase contracts.

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Bennett, Kathryn | 227 | 4/2/2007 | Updated Purchase Agreement | Sep-07 | 152,940 | 510,000 | 8/7/2008 | 1 year 1 month | 6:09-ap-770 |
| Brearley, James & Joanne | 116 | 6/7/2007 | Updated Purchase Agreement | Sep-07 | 100,000 | 500,000 | 4/1/2009 | 1 year 9 months | 6:09-ap-49 |
| Byrne, Anne Marie & Maurice | 303 | 4/29/2007 | Updated Purchase Agreement | Sep-07 | 88,500 | 375,000 | 2/25/2009 | 1 year 8 months | 6:09-ap-49 |
| Byrne, Anne Marie & Maurice | 319 | 4/29/2007 | Updated Purchase Agreement | Sep-07 | 88,500 | 510,000 | 2/25/2009 | 1 year 8 months | 6:09-ap-49 |
| Hankins, Michael and Ellen | 436 | 5/30/2007 | Updated Purchase Agreement | Sep-07 | 124,500 | 415,000 | 8/7/2008 | 11 months | 6:09-ap-859 |
| Hankins, Michael and Ellen | 525 | 5/30/2007 | Updated Purchase Agreement | Sep-07 | 159,000 | 530,000 | 8/7/2008 | 11 months | 6:09-ap-859 |
| Maxwell, Malcom | 513 | 9/4/2007 | Updated Purchase Agreement | Nov-07 | 154,000 | 515,000 | 9/19/2008 | 1 year | 6:09-ap-859 |
| Patel, Dharmesh | 406 | 7/27/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 1 month | 6:09-ap-859 |
| Patel, Sadhana | 122 | 6/1/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 11 months | 6:09-ap-859 |
| Patel, Sadhana | 123 | 6/1/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 11 months | 6:09-ap-859 |

*NOTE: All plaintiffs in Appendix A signed Updated Purchase Contracts (post March 2006), which are exempt from the ILSFDA.

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| | | | APPENDIX B - Plaintiffs who timely filed damage claims within 3 years of signing purchase contracts. | | | | | | |
| Adamson, Peter & Roseleen | 402 | 3/30/2007 | Updated Purchase Agreement | Sep-07 | 75,000 | 375,000 | 5/26/2009 | 2 years 1 month | 6:09-ap-769 |
| Adamson, Peter & Roseleen | 505 | 3/30/2007 | Updated Purchase Agreement | Sep-07 | 77,000 | 385,000 | 5/26/2009 | 2 years 1 month | 6:09-ap-769 |
| Askeland, Morten | 320 | 2/27/2007 | Updated Purchase Agreement | Sep-07 | 98,000 | 490,000 | 4/1/2009 | 2 years 1 month | 6:09-ap-49 |
| Augland, Olvind | 304 | 2/27/2007 | Updated Purchase Agreement | Sep-07 | 71,000 | 355,000 | 4/1/2009 | 2 years 1 month | 6:09-ap-49 |
| Bennett, Kathryn | 227 | 4/2/2007 | Updated Purchase Agreement | Sep-07 | 152,940 | 510,000 | 8/7/2008 | 1 year 1 month | 6:09-ap-859 |
| BFAM, LLC (Gregory Tolver Jr.) | 547 | 12/29/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 8/7/2008 | 2 years 7 months | 6:09-ap-859 |
| Booth, Jason | 538 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 7/30/2008 | 2 years 8 months | 6:09-ap-49 |
| Brearley, James & Joanne | 116 | 6/7/2007 | Updated Purchase Agreement | Sep-07 | 100,000 | 500,000 | 4/1/2009 | 1 year 9 months | 6:09-ap-49 |
| Byrne, Anne Marie & Maurice | 303 | 4/29/2007 | Updated Purchase Agreement | Sep-07 | 88,500 | 375,000 | 2/25/2009 | 1 year 8 months | 6:09-ap-49 |
| Byrne, Anne Marie & Maurice | 319 | 4/29/2007 | Updated Purchase Agreement | Sep-07 | 88,500 | 375,000 | 2/25/2009 | 1 year 8 months | 6:09-ap-49 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Carlson, Noreen | 347 | 9/26/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Crovetto, Giovanni | 221 | 1/17/2006 | Original Purchase Agreement | Apr-07 | 62,100 | 414,000 | 1/14/2009 | 2 years 10 months | 6:09-ap-49 |
| Deiulio, William | 538 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 7/30/2008 | 2 years 8 months | 6:09-ap-49 |
| Denvir, David | 529 | 2/16/2007 | Updated Purchase Agreement | Sep-07 | 75,000 | 375,000 | 5/26/2009 | 2 years 6 months | 6:09-ap-769 |
| Dodsworth, Karen | 108 | 6/22/2006 | Updated Purchase Agreement | Sep-07 | 69,000 | 345,000 | 5/26/2009 | 2 years 11 months | 6:09-ap-769 |
| Flaugher, Sean | 140 | 10/3/2005 | Original Purchase Agreement | Apr-07 | 54,000 | 360,000 | 8/18/2008 | 2 years 10 months | 6:09-ap-49 |
| Halbeck, Eric | 418 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Hannon, Brian | 423 | 6/13/2006 | Updated Purchase Agreement | Sep-07 | 104,437 | 365,000 | 9/19/2008 | 2 years 3 months | 6:09-ap-770 |
| Hankins, Michael and Ellen | 436 | 5/30/2007 | Updated Purchase Agreement | Sep-07 | 124,500 | 415,000 | 8/7/2008 | 11 months | 6:09-ap-859 |
| Hankins, Michael and Ellen | 525 | 5/30/2007 | Updated Purchase Agreement | Sep-07 | 159,000 | 530,000 | 8/7/2008 | 11 months | 6:09-ap-859 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Honcharik, Michael | 418 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Jackson-Herron, Marqudi | 237 | 11/28/2005 | Original Purchase Agreement | Apr-07 | 64,350 | 429,000 | 8/7/2008 | 2 years 8 months | 6:09-ap-859 |
| Jarvis, Leslie and Jeffrey | 203 | 1/19/2007 | Updated Purchase Agreement | Sep-07 | 106,500 | 355,000 | 5/26/2009 | 2 years 4 months | 6:09-ap-859 |
| Kurtzman, Kelly & Steve | 141 | 11/30/2005 | Original Purchase Agreement | Apr-07 | 66,900 | 446,000 | 11/25/2008 | 2 years 11 months | 6:09-ap-770 |
| Lieberman, Maris | 136 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 50,850 | 339,000 | 8/7/2008 | 2 years 9 months | 6:09-ap-859 |
| Lenihan, Patrick | 140 | 10/3/2005 | Original Purchase Agreement | Apr-07 | 54,000 | 360,000 | 8/18/2008 | 2 years 10 months | 6:09-ap-49 |
| Lists, John & Susan | 410 | 4/1/2006 | Original Purchase Agreement | Jul-07 | 50,850 | 339,000 | 11/18/2008 | 2 years 5 months | 6:09-ap-770 |
| Lynch, Charles | 439 | 9/22/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 7 months | 6:09-ap-49 |
| Maxwell, Malcom | 513 | 9/4/2007 | Updated Purchase Agreement | Nov-07 | 154,000 | 515,000 | 9/19/2008 | 1 year | 6:09-ap-770 |
| McKibbin, Moire | 238 and | 9/22/2005 | Original Purchase Agreement | Apr-07 | 55,050.01 | 367,000.00 | 9/19/2008 | 2 years 11 months | 6:09-ap-770 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| McKibbin, Moire | 246 | 9/23/2005 | Original Purchase Agreement | Apr-07 | 55,050.00 | 367,000.00 | 9/19/2008 | 2 years 11 months | 6:09-ap-770 |
| Mondello, Anthony | 538 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 7/30/2008 | 2 years 8 months | 6:09-ap-49 |
| O'Sullivan, Dennis & Kathryn | 517 | 9/28/2005 | Original Purchase Agreement | Apr-11 | 60,615 | 404,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Ormson, Robert & Susan | 218 | 2/27/2006 | Original Purchase Agreement | Jul-11 | 82,800 | 414,000 | 2/25/2009 | 2 years 11 months | 6:09-ap-49 |
| Patel, Dharmesh | 405 | 5/29/2006 | Updated Purchase Agreement | Sep-07 | 67,251 | 336,250 | 8/7/2008 | 2 years | 6:09-ap-859 |
| Patel, Dharmesh | 507 | 5/29/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 2 years | 6:09-ap-859 |
| Patel, Dharmesh | 406 | 7/27/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 1 month | 6:09-ap-859 |
| Patel, Rajesh | 305 | 5/31/2006 | Updated Purchase Agreement | Sep-07 | 68,000 | 340,000 | 8/7/2008 | 2 years 2 months | 6:09-ap-859 |
| Patel, Sadhana | 122 | 6/1/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 11 months | 6:09-ap-859 |
| Patel, Sadhana | 123 | 6/1/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 11 months | 6:09-ap-859 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Reardon, Krystyn | 226 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 47,100 | 314,000 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Savino, Anthony | 511 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 53,850 | 359,000 | 6/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Savino, Anthony | 536 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 56,100 | 374,000 | 6/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Spurlock, Julia & Timothy | 348 | 9/27/2005 | Original Purchase Agreement | Apr-07 | 64,350 | 429,000 | 9/18/2008 | 2 years 11 months | 6:09-ap-859 |
| Vinueza, Vincent | 221 | 1/17/2006 | Original Purchase Agreement | Apr-07 | 62,100 | 414,000 | 1/14/2009 | 2 years 10 months | 6:09-ap-49 |
| | | | | | | | | | |

*NOTE: Only plaintiffs in Appendix B who signed  original purchase contracts (pre March 2006), are entitled to bring ILSFDA claims for damages.

| APPENDIX C - Plaintiffs who filed their ILSFDA claims more than 3 years after signing their purchase contracts. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
| Ajogbasile, Mosunmola | 124 | 9/25/2005 | Original Purchase Agreement | Apr-07 | 52,350 | 349,000 | 2/25/2009 | 3 years 5 months | 6:09-ap-49 |
| Baggott, Maureen | 545 | 1/3/2006 | Original Purchase Agreement | Apr-07 | 92,800 | 464,000 | 5/26/2009 | 3 years 7 months | 6:09-ap-769 |
| Bloe, Chancelle | 103 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 49,850 | 299,000 | 4/1/2009 | 3 years 6 months | 6:09-ap-49 |
| Briggs, Thomas J. | 229 | 12/2/2005 | Original Purchase Agreement | Apr-07 | 43,740 | 291,600 | 5/22/2009 | 3 years 5 months | 6:09-ap-859 |
| Bruno, Laura | 535 | 9/26/2005 | Original Purchase Agreement | Apr-07 | 40,365 | 269,100 | 2/25/2009 | 3 years 3 months | 6:09-ap-49 |
| Gonzalez, Alvaro & Dario | 523 | 1/12/2006 | Original Purchase Agreement | Apr-07 | 70,800 | 354,000 | 5/26/2009 | 3 years 4 months | 6:09-ap-769 |
| Han, Hong Ju | 512 | 10/3/2005 | Original Purchase Agreement | Apr-07 | 59,850 | 399,000 | 4/1/2009 | 3 years 5 months | 6:09-ap-49 |
| Holden, Jacqueline & Paul | 515 | 10/11/2005 | Original Purchase Agreement | Apr-07 | 64,350 | 429,000 | 2/25/2009 | 3 years 4 months | 6:09-ap-49 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Holdstock, Andrew Jack | 126 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 59,850 | 399,000 | 5/26/2009 | 3 years 7 months | 6:09-ap-769 |
| Marklew, Clive & Jessica | 219 | 11/10/2005 | Original Purchase Agreement | Apr-07 | 62,100 | 414,000 | 4/1/2009 | 3 years 4 months | 6:09-ap-49 |
| Owen, Gregory | 524 | 9/30/2005 | Original Purchase Agreement | Apr-07 | 44,850 | 429,000 | 2/25/2009 | 3 years 4 months | 6:09-ap-49 |
| Perry, Melissa & Martin | 247 | 6/20/2005 | Original Purchase Agreement | Apr-07 | 53,100 | 371,070 | 5/26/2009 | 3 years 11 months | 6:09-ap-769 |
| Pezzillo, Brian | 247 | 6/20/2005 | Original Purchase Agreement | Apr-07 | 53,100 | 371,070 | 5/26/2009 | 3 years 11 months | 6:09-ap-769 |
| Richards, Jene Martins & Nathaniel Dean | 125 | 9/24/2005 | Original Purchase Agreement | Apr-07 | 54,850 | 349,000 | 2/25/2009 | 3 years 5 months | 6:09-ap-49 |
| Scott, Brenda & Gilbert | 125 | 9/24/2005 | Original Purchase Agreement | Apr-07 | 54,850 | 349,000 | 2/25/2009 | 3 years 5 months | 6:09-ap-49 |
| Southcott, Michael | 545 | 1/3/2006 | Original Purchase Agreement | Apr-07 | 92,800 | 464,000 | 5/26/2009 | 3 years 7 months | 6:09-ap-769 |
| Staples, Gracie Hill | 124 | 9/25/2005 | Original Purchase Agreement | Apr-07 | 52,350 | 349,000 | 2/25/2009 | 3 years 5 months | 6:09-ap-49 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Doreen Nelson and Martin Imbembo | 546 | 2/27/2006 | Original Purchase Agreement | Jul-07 | 78,750 | 525,000 | 1/12/2010 | 3 years 10 months | 6:09-ap-769 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Adamson, Peter & Roseleen | 402 | 3/30/2007 | Updated Purchase Agreement | Sep-07 | 75,000 | 375,000 | 5/26/2009 | 2 years 1 month | 6:09-ap-769 |
| Adamson, Peter & Roseleen | 505 | 3/30/2007 | Updated Purchase Agreement | Sep-07 | 77,000 | 385,000 | 5/26/2009 | 2 years 1 month | 6:09-ap-769 |
| Askeland, Morten | 320 | 2/27/2007 | Updated Purchase Agreement | Sep-07 | 98,000 | 490,000 | 4/1/2009 | 2 years 1 month | 6:09-ap-49 |
| Augland, Olvind | 304 | 2/27/2007 | Updated Purchase Agreement | Sep-07 | 71,000 | 355,000 | 4/1/2009 | 2 years 1 month | 6:09-ap-49 |
| Bennett, Kathryn | 227 | 4/2/2007 | Updated Purchase Agreement | Sep-07 | 152,940 | 510,000 | 8/7/2008 | 1 year 1 mont | 6:09-ap-859 |
| Brearley, James & Joanne | 116 | 6/7/2007 | Updated Purchase Agreement | Sep-07 | 100,000 | 500,000 | 4/1/2009 | 1 year 9 months | 6:09-ap-49 |
| Byrne, Anne Marie & Maurice | 303 | 4/29/2007 | Updated Purchase Agreement | Sep-07 | 88,500 | 375,000 | 2/25/2009 | 1 year 8 months | 6:09-ap-49 |
| Byrne, Anne Marie & Maurice | 319 | 4/29/2007 | Updated Purchase Agreement | Sep-07 | 88,500 | 375,000 | 2/25/2009 | 1 year 8 months | 6:09-ap-49 |
| Denvir, David | 529 | 2/16/2007 | Updated Purchase Agreement | Sep-07 | 75,000 | 375,000 | 5/26/2009 | 2 years 6 months | 6:09-ap-769 |
| Dodsworth, Karen | 108 | 6/22/2006 | Updated Purchase Agreement | Sep-07 | 69,000 | 345,000 | 5/26/2009 | 2 years 11 months | 6:09-ap-769 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Hankins, Michael and Ellen | 436 | 5/30/2007 | Updated Purchase Agreement | Sep-07 | 124,500 | 415,000 | 8/7/2008 | 11 months | 6:09-ap-859 |
| Hankins, Michael and Ellen | 525 | 5/30/2007 | Updated Purchase Agreement | Sep-07 | 159,000 | 530,000 | 8/7/2008 | 11 months | 6:09-ap-859 |
| Hannon, Brian | 423 | 6/13/2006 | Updated Purchase Agreement | Sep-07 | 104,437 | 365,000 | 9/19/2008 | 2 years 3 months | 6:09-ap-770 |
| Jarvis, Leslie and Jeffrey | 203 | 1/19/2007 | Updated Purchase Agreement | Sep-07 | 106,500 | 355,000 | 5/26/2009 | 2 years 4 mon | 6:09-ap-859 |
| Maxwell, Malcom | 513 | 9/4/2007 | Updated Purchase Agreement | Nov-07 | 154,000 | 515,000 | 9/19/2008 | 1 year | 6:09-ap-859 |
| Maxwell, Malcom | 513 | 9/4/2007 | Updated Purchase Agreement | Nov-07 | 154,000 | 515,000 | 9/19/2008 | 1 year | 6:09-ap-770 |
| Patel, Dharmesh | 406 | 7/27/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 1 mont | 6:09-ap-859 |
| Patel, Dharmesh | 405 | 5/29/2006 | Updated Purchase Agreement | Sep-07 | 67,251 | 336,250 | 8/7/2008 | 2 years | 6:09-ap-859 |
| Patel, Dharmesh | 507 | 5/29/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 2 years | 6:09-ap-859 |
| Patel, Rajesh | 305 | 5/31/2006 | Updated Purchase Agreement | Sep-07 | 68,000 | 340,000 | 8/7/2008 | 2 years 2 mon | 6:09-ap-859 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Patel, Sadhana | 122 | 6/1/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 11 mon | 6:09-ap-859 |
| Patel, Sadhana | 123 | 6/1/2006 | Updated Purchase Agreement | Sep-07 | 67,400 | 337,000 | 8/7/2008 | 1 year 11 mon | 6:09-ap-859 |

*Some of these plaintiffs are also listed in Appendix A as plaintiffs who signed Updated Purchase Agreements and brought automatic rescission claims within 2 years of signing their contracts.

| APPENDIX E - Plaintiffs who signed Original Purchase Agreements and timely filed damage claims within 3 years of signing purchase contracts. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
| BFAM, LLC (Gregory Tolver Jr.) | 547 | 12/29/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 8/7/2008 | 2 years 7 months | 6:09-ap-859 |
| Booth, Jason | 538 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 7/30/2008 | 2 years 8 months | 6:09-ap-49 |
| Carlson, Noreen | 347 | 9/26/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Crovetto, Giovanni | 221 | 1/17/2006 | Original Purchase Agreement | Apr-07 | 62,100 | 414,000 | 1/14/2009 | 2 years 10 months | 6:09-ap-49 |
| Deiulio, William | 538 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 7/30/2008 | 2 years 8 months | 6:09-ap-49 |
| Flaugher, Sean | 140 | 10/3/2005 | Original Purchase Agreement | Apr-07 | 54,000 | 360,000 | 8/18/2008 | 2 years 10 months | 6:09-ap-49 |
| Halbeck, Eric | 418 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Honcharik, Michael | 418 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Kurtzman, Kelly & Steve | 141 | 11/30/2005 | Original Purchase Agreement | Apr-07 | 66,900 | 446,000 | 11/25/2008 | 2 years 11 months | 6:09-ap-770 |
| Jackson-Herron, Marqudi | 237 | 11/28/2005 | Original Purchase Agreement | Apr-07 | 64,350 | 429,000 | 8/7/2008 | 2 years 8 months | 6:09-ap-859 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Lenihan, Patrick | 140 | 10/3/2005 | Original Purchase Agreement | Apr-07 | 54,000 | 360,000 | 8/18/2008 | 2 years 10 months | 6:09-ap-49 |
| Lieberman, Maris | 136 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 50,850 | 339,000 | 8/7/2008 | 2 years 9 months | 6:09-ap-859 |
| Lists, John & Susan | 410 | 4/1/2006 | Original Purchase Agreement | Jul-07 | 50,850 | 339,000 | 11/18/2008 | 2 years 5 months | 6:09-ap-770 |
| Lynch, Charles | 439 | 9/22/2005 | Original Purchase Agreement | Apr-07 | 53,865 | 359,100 | 5/6/2008 | 2 years 7 months | 6:09-ap-49 |
| McKibbin, Moire | 238 and | 9/22/2005 | Original Purchase Agreement | Apr-07 | 55,050.01 | 367,000.00 | 9/19/2008 | 2 years 11 months | 6:09-ap-770 |
| McKibbin, Moire | 246 | 9/23/2005 | Original Purchase Agreement | Apr-07 | 55,050.00 | 367,000.00 | 9/19/2008 | 2 years 11 months | 6:09-ap-770 |
| Mondello, Anthony | 538 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 69,600 | 464,000 | 7/30/2008 | 2 years 8 months | 6:09-ap-49 |
| O'Sullivan, Dennis & Kathryn | 517 | 9/28/2005 | Original Purchase Agreement | Apr-11 | 60,615 | 404,100 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Ormson, Robert & Susan | 218 | 2/27/2006 | Original Purchase Agreement | Jul-11 | 82,800 | 414,000 | 2/25/2009 | 2 years 11 months | 6:09-ap-49 |
| Reardon, Krystyn | 226 | 9/29/2005 | Original Purchase Agreement | Apr-07 | 47,100 | 314,000 | 5/6/2008 | 2 years 6 months | 6:09-ap-49 |

| Name of Claimant | Unit No. | Date of Purchase Agreement | Form | Estimated Closing Date | Deposit Amount | Purchase Price | Earlier of Date Proceeding Filed or First Effort to Rescind | Years from PA to Proceeding | Adversary Proceeding / District Court Civil Case No. |
|---|---|---|---|---|---|---|---|---|---|
| Savino, Anthony | 511 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 53,850 | 359,000 | 6/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Savino, Anthony | 536 | 10/28/2005 | Original Purchase Agreement | Apr-07 | 56,100 | 374,000 | 6/6/2008 | 2 years 6 months | 6:09-ap-49 |
| Spurlock, Julia & Timothy | 348 | 9/27/2005 | Original Purchase Agreement | Apr-07 | 64,350 | 429,000 | 9/18/2008 | 2 years 11 months | 6:09-ap-859 |
| Vinueza, Vincent | 221 | 1/17/2006 | Original Purchase Agreement | Apr-07 | 62,100 | 414,000 | 1/14/2009 | 2 years 10 months | 6:09-ap-49 |